**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION**

**CRYSTAL N. FINNIE**                                                                    **PLAINTIFF**

**v.**                                                                                   **NO.: 1:10cv64-A-S**

**LEE COUNTY, MISSISSIPPI and
JIM H. JOHNSON, SHERIFF
OF LEE COUNTY, MISSISSIPPI,
In His Official Capacity**                                                               **DEFENDANTS**

## <u>MEMORANDUM OPINION</u>

Presently before the Court are Defendants' Motions for Summary Judgment [59, 67, 70].[1] After considering the motions, response, rules, and authorities, the Court finds as follows:

## <u>BACKGROUND</u>

In October 2004, Plaintiff Crystal Finnie began working for the Lee County Sheriff's Department.  Plaintiff was employed as a detention officer at the Lee County Juvenile Detention Center ("JDC") until her termination in April 2009.  Plaintiff had an array of job duties, as she was responsible for booking, searching, feeding, escorting, and transporting detainees, conducting searches of cells, and handling disturbances. It is undisputed that detention officers, like Plaintiff, are subject to a uniform policy that states, in pertinent part, that detention officers must wear pants furnished by the sheriff's department.

---

[1] Defendants' Supplemental Motions for Summary Judgment [67, 70] are not motions separate and distinct from the original motion [59]. Instead, the supplemental motions merely provide additional evidence to support the original motion. As such, the Court does not consider these motions independently, instead analyzing all three motions as one.

Plaintiff abided by this uniform policy, apparently without complaint, until September 2008. Plaintiff asserts that she converted to the Pentecostal faith in August 2008, and, due to this, she was under the conviction that she could no longer wear pants. In September 2008, Plaintiff allegedly met with Sheriff Jim Johnson, informed him that wearing pants would violate her religious beliefs, and requested an exemption from the uniform policy.[2] Plaintiff asserts that Sheriff Johnson was, at that time, "real supportive" of her beliefs. At some point in or around September 2008,[3] Plaintiff asked JDC administrator Steve White for permission to wear a skirt instead of the prescribed "pants-only" uniform. Steve White told Plaintiff that he would have to ask Sheriff Johnson.

Before hearing back from Sheriff Johnson or Steve White, Plaintiff began wearing a skirt[4] to work on or about March 6, 2009.[5] On March 16, 2009, after Plaintiff returned from escorting three juveniles to court, she was confronted by Corey Finnie,[6] who informed Plaintiff that Steve White had stated that if Plaintiff wore her skirt again to work, she would

---

[2] Whether or not this September 2008 meeting with Sheriff Johnson occurred appears to be disputed between the parties. Yet, this dispute is not material to the Court's decision.

[3] Steve White at first asserted that Plaintiff came to him in November 2008; however, during his deposition testimony he said that it actually "could have been" September 2008.

[4] According to Plaintiff's deposition testimony, the skirt was khaki twill, straight, and long, reaching the ankles.

[5] Plaintiff contends that she did not receive a response from anyone at JDC about her request for an exemption from the policy before she started wearing a skirt to work. That is, Plaintiff asserts that she did not receive a response until March 16, 2009. Defendants, on the other hand, contend that Steve White conveyed the Sheriff's negative response to Plaintiff's request prior to Plaintiff's decision to begin wearing a skirt in violation of the uniform policy. For purposes of this Memorandum Opinion, and because this factual dispute is not material to the outcome of the case, the Court views the evidence in the light most favorable to Plaintiff and accepts Plaintiff's version of the facts as they relate to this dispute.

[6] Corey Finnie was Plaintiff's direct supervisor and shift sergeant and is the brother of Plaintiff's husband.

be suspended for three days without pay. Plaintiff was also directly approached by Steve White later that same day, and White confirmed what Corey Finnie had stated. After receiving this directive, Plaintiff asserts that she then personally appealed to Sheriff Johnson to allow her to wear a skirt. Sheriff Johnson told Plaintiff, on March 16, 2009, that he had one more call he was waiting on to confirm whether or not Plaintiff could wear a skirt while at work. He informed Plaintiff that he would get back in touch with her by the end of her shift. Around 5:45 p.m. on the same day, Plaintiff received a call from Steve White, informing her that she could either wear pants in compliance with the uniform policy or turn in a letter of resignation.

The following day, March 17, 2009, Plaintiff called Steve White and asked for permission to begin taking her accumulated vacation leave, apparently hoping that the Sheriff would reconsider his decision while she was on leave. While on leave, Plaintiff met with an attorney and, on March 19, 2009, she filed a charge of religious and gender discrimination with the EEOC. Plaintiff's attorney mailed a letter[7] and a copy of Plaintiff's EEOC charge to Sheriff Johnson. Sheriff Johnson did not respond to the letter.[8]

In April 2009, after Plaintiff's vacation time was apparently used up, Plaintiff either called, or met with, Steve White to see if there was any change in the situation concerning the Sheriff's decision with respect to the uniform policy. White told Plaintiff that she would be required to wear pants. Specifically, according to Plaintiff, White stated, "just put your pants

---

[7] Plaintiff's counsel appears to have actually mailed Sheriff Johnson the letter on March 18, 2009.
[8] It is not disputed that Sheriff Johnson received both the letter and the copy of the EEOC charge.

on and come back to work." Plaintiff again communicated to White that she could not wear pants based on religious reason. The very next day, Plaintiff met with Sheriff Johnson.[9] At this meeting, Sheriff Johnson terminated Plaintiff's employment.

Plaintiff filed this lawsuit on March 12, 2010, alleging that her termination violated her First Amendment rights of free speech and the free exercise of religion and constituted religious and gender discrimination and retaliation under Title VII of the Civil Rights Act of 1964. Defendants have filed three Motions for Summary Judgment, arguing they are entitled to judgment as a matter of law as to all of Plaintiff's claims.

## LEGAL STANDARD

Summary judgment is warranted under Rule 56(a) of the Federal Rules of Civil Procedure when evidence reveals no genuine dispute regarding any material fact and that the moving party is entitled to judgment as a matter of law. The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record]

---

[9] Plaintiff asserts that she met with Steve White on April 13, 2009, and that she met with Sheriff Johnson and was terminated on April 14, 2009. Defendants assert that that the conversation with White occurred on April 27, and that Plaintiff met with Sheriff Johnson and was terminated on April 28. This factual dispute does not affect the Court's determination on any of Plaintiff's claims. As such, the Court – for purposes of this Memorandum Opinion – views the evidence in the light most favorable to the Plaintiff and accepts Plaintiff's version of the facts as they relate to this dispute over dates.

which it believes demonstrate the absence of a genuine issue of material fact." Id. at 323, 106 S. Ct. 2548. The nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324, 106 S. Ct. 2548 (citation omitted). In reviewing the evidence, factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). When such contradictory facts exist, the Court may "not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000). However, conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments have never constituted an adequate substitute for specific facts showing a genuine issue for trial. TIG Ins. Co. v. Sedgwick James of Wash., 276 F.3d 754, 759 (5th Cir. 2002); SEC v. Recile, 10 F.3d 1093, 1097 (5th Cir. 1997); Little, 37 F.3d at 1075.

## DISCUSSION AND ANALYSIS

A. Free Speech Under the First Amendment

Plaintiff has conceded her First Amendment free speech claim in her brief in opposition to summary judgment. As such, the Court does not analyze the issue, and Defendants are entitled to summary judgment on this claim.

B. Free Exercise of Religion Under the First Amendment

Defendants contend that they are entitled to judgment as a matter of law because the uniform policy utilized is rationally related to Lee County's legitimate interest in safety and security in the JDC. Plaintiff, in response, does not contend otherwise; instead, Plaintiff

asserts that collateral estoppel prohibits Defendants from litigating this claim, as it was allegedly litigated before the Board of Review of the Mississippi Department of Employment Security ("MDES").[10]

In order to understand this issue, some background information is needed. After Plaintiff was terminated, she applied for unemployment benefits, and an Administrate Law Judge found in Plaintiff's favor. Defendants appealed to the Board of Review, which issued a remand order directing additional testimony to be taken. After such additional testimony had been gathered, the Board of Review issued a decision finding in favor of Plaintiff. Specifically, the Board of Review found – in pertinent part – as follows:

> The question before the Board of Review, therefore, is whether there is a compelling state interest which overcomes the religious right and whether the state is pursuing this interest through the least restrictive means. The Board finds the employer did not meet its burden by showing the policy met a state [sic] compelling state interest. Specifically, the Board questions whether the claimant would be less able to perform her job in a skirt and finds that the employer did not provide evidence of the same. The Board also questions the employer's assertion that no accommodation could be made to adapt to the claimant's religious beliefs. In other words, the Board finds the employer did not pursue its stated objective using the least restrictive means available.

Lee County appealed the Board of Review decision that Plaintiff was entitled to unemployment benefits to the Circuit Court of Lee County pursuant to Mississippi Code

---

[10] The Court notes that, in her response in opposition to summary judgment, Plaintiff asserts that "this Court should grant Plaintiff a judgment as a matter of law on Finnie's Free Exercise Claim under the First Amendment." To any extent Plaintiff intended to move for summary judgment through its response, the Court declines to consider such, as Local Rule 7(b) notes that "any written communication with the court that is intended to be an application for relief or other action by the court must be presented *by a motion* . . . ." L. U. Civ. R. 7(b) (emphasis added).

Annotated § 71-5-531. On July 26, 2011, the circuit court ordered that the matter should be remanded to the Board of Review for additional fact finding. For the reasons discussed herein, the Court finds collateral estoppel does not prohibit the Defendants from litigating its defense to Plaintiff's free exercise claim.

Instead of the usual (i.e., defensive) use of collateral estoppel, Plaintiff seeks to apply it offensively, requesting that the Court declare that – as a matter of law – Defendants violated Plaintiff's rights under the Free Exercise Clause due to certain determinations made by the Mississippi Department of Employment Security. The law is clear that "when a state agency acting in a judicial capacity . . . resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, federal courts must give the agency's fact-finding the same preclusive effect to which it would be entitled in the State's courts." Univ. of Tenn. v. Elliott, 478 U.S. 788, 799, 106 S. Ct. 3220, 92 L. Ed. 2d 635 (1986) (internal quotation marks, alteration, and citation omitted). "Under Mississippi law, res judicata or collateral estoppel precludes relitigation of administrative decisions."[11] Smith v. Univ. of Miss., 797 So. 2d 956, 963 (Miss. 2001) (involving a terminated state employee who failed to appeal the dismissal decision of the Personnel Action Review Board to the circuit court by writ of certiorari as mandated by Miss. Code Ann. §§ 11-51-93 and -95); see also Zimmerman v. Three Rivers Planning & Dev. Dist., 747 So. 2d 853, 861 (Miss. Ct. App. 1999) (involving the failure to file an appeal of the Permit Board's decision within twenty days after it was entered into the books as mandated by Miss. Code Ann. § 49-17-29). "'Once

---

[11] Specifically, the decisions of the MESC are given preclusive weight in Mississippi courts, if supported by the evidence and in the absence of fraud. MISS. CODE ANN. § 71-5-531; Raiola v. Chevron U.S.A., Inc., 872 So. 2d 79, 84 (Miss. Ct. App. 2004).

an agency decision is made and the decision remains unappealed beyond the time to appeal, it is barred by administrative res judicata or collateral estoppel.'" A & F Prop., LLC v. Madison Cnty. Bd. Of Sup'rs, 933 So. 2d 296, 302 (Miss. 2006) (quoting Zimmerman, 747 So. 2d at 861) (citing Hood v. Miss. Dep't of Wildlife Conservation, 571 So. 2d 263, 268 (Miss. 1990)).[12]

Plaintiff relies solely on Cox v. DeSoto County, Miss., 564 F.3d 745 (5th Cir. 2009) for the proposition that she may invoke collateral estoppel to preclude Defendants from defending Plaintiff's free exercise claim. In Cox, the plaintiff alleged that she was transferred from her secretarial position in the sheriff's office to a position in the jail for which she was not trained or qualified due to her age and her refusal to campaign actively for the sheriff's re-election. Plaintiff eventually filed suit on these claims, although she continued to be employed at the jail. While her first suit was pending, plaintiff made a report to her jail supervisor to the effect that she had witnessed abuse of a jailed inmate by several officers. Following an investigation by the DeSoto County District Attorney's office, it was found that no misconduct occurred and that plaintiff gave inconsistent statements about the events she allegedly witnessed. Plaintiff was terminated for giving a false report. She amended her complaint in the wrongful transfer lawsuit, contending that DeSoto County terminated her in retaliation for filing the wrongful transfer lawsuit and that the reason given for her firing was

---

[12] The Hood decision has been overruled on other grounds by East Mississippi State Hospital v. Callens, 892 So. 2d 800, 822 (Miss. 2004). There, the court overruled Hood to the extent it denies a discharged state employee the right to assert appropriated Section 1983 claims against state officials in their personal or individual capacities.

pretextual. She later sued several individual defendants, such as the sheriff and the district attorney; that suit was consolidated with the original DeSoto County suit.

The plaintiff filed for unemployment benefits, and the Mississippi Employment Security Commission ("MESC") conducted a hearing and determined that plaintiff was not eligible for benefits because she was discharged for work-related misconduct. She unsuccessfully appealed to an Appeals Referee and Board of Review. She then filed an appeal in the local circuit court, which she ultimately dismissed. After the dismissal of her administrative case, the defendants in the wrongful transfer/termination case filed a motion for summary judgment contending that the collateral estoppel effect of the MESC ruling barred her case in federal district court. The court granted the summary judgment as to the termination claims.

The Fifth Circuit, on appeal, was faced – in pertinent part – with the question of whether or not the court should give collateral estoppel effect to the MESC's findings. The court found as follows:

> Although Cox *voluntarily dismissed her judicial appeal* of the MESC ruling, she now *seeks to attack that ruling collaterally* by contending that a non-judicially reviewed decision of the MESC should not be granted preclusive effect. She also contends that the ruling was not based upon substantial evidence and was tainted with fraud. Cox's failure to fully pursue an appeal under § 71-5-531 does not undermine the preclusive effect of the MESC's decision. See Raiola, 872 So. 2d at 84 (forbidding collateral attack of MESC decision where claimant sought and received voluntary dismissal of appeal under § 71-5-531). If there were no opportunity for judicial review, we would have a potentially different situation. *Here, however, it is Cox who failed to pursue her appropriate avenues to challenge the judgment.* Had she done so, she would have had the opportunity to present evidence, if any, that the MESC's decision was tainted by fraud or based on a lack of substantial

evidence. See NCI Bldg. Components v. Berry, 811 So. 2d 321, 329 (Miss.Ct.App.2001) (noting that a court lacks the power to overturn the findings of the MESC unless evidence is presented that the findings are "riddled with fraud" or based on a lack of substantial evidence). Because Cox failed to fully avail herself of this avenue, she cannot now collaterally attack the MESC's decision.

Id. at 749 (emphasis added).[13] In Cox, as well as in Raiola v. Chevron U.S.A., Inc., 872 So. 2d 79, 84 (Miss. Ct. App. 2004), the party against whom collateral estoppel was asserted had elected *not* to pursue an appeal to the circuit court. The decisions of the administrative decisions were final; thus, collateral estoppel could be properly invoked.  In contrast, in the case at bar, Defendants have not only filed an appeal of the Board of Review's finding to the Circuit Court of Lee County, but the circuit court has also ordered that the matter be remanded.  Thus, Plaintiff's reliance on Cox to invoke collateral estoppel in this action is misplaced, as the holding of Cox is inapposite to the situation presented here.[14]

---

[13] Plaintiff appears to also ask the Court to apply Cox's conclusion regarding collateral estoppel to Plaintiff's Title VII claims. The Court declines to do so, as Cox directly addressed this issue, noting that "under Supreme Court authority, [ ] collateral estoppel does not apply to state administrative decisions where Congress has provided for a detailed administrative remedy . . . ." 564 F.3d at 748-49 (citing Astoria Fed. Sav. & Loan Ass'n v. Solimino, 501 U.S. 104, 110-14, 111 S. Ct. 2166, 115 L. Ed. 2d 96 (1991)).

[14] The Court also notes that collateral estoppel could not be invoked to preclude Defendants from defending Plaintiff's free exercise claim in this instance due to the differing applicable burdens of proof in this litigation and the prior. The Board of Review's conclusion of law was that "the employer did not meet its burden by showing the policy met a state [sic] compelling state interest." However, as discussed *infra*, the Defendants need only show that the policy is rationally related to a legitimate interest, see Daniels v. City of Arlington, 246 F.3d 500 (5th Cir. 2001) and Employment Division v. Smith, 494 U.S. 872, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990), as the uniform policy at issue is neutral (i.e., not aimed at religious belief) and only incidentally burdens religious practice. The compelling interest test is a much higher burden than the rationally related standard that Defendants face in this action. See REST 2D JUDG. § 28(4) ("Although an issue is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, relitigation of the issue in a

After determining the collateral estoppel doctrine to be inapplicable, the Court turns to the merits of Plaintiff's free exercise claim.[15]   The Free Exercise Clause of the First Amendment, applicable to the states through the Fourteenth Amendment, forbids the adoption of laws designed to suppress religious beliefs or practices unless justified by a compelling governmental interest and narrowly tailored to meet that interest. See Church of the Lukimi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 531, 113 S. Ct. 2217, 124 L. Ed. 2d 472 (1993). The Free Exercise Clause, however, "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." Employment Div., Dept. of Human Resources of Or. v. Smith, 494 U.S. 872, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990) (internal quotation marks omitted). "A law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." Church of Lukumi, 508 U.S. at 531, 113 S. Ct. 2217.

---

subsequent action between the parties is not precluded in the following circumstances: (4) The party against whom preclusion is sought had a significantly heavier burden of persuasion with respect to the issue in the initial action than in the subsequent action; the burden has shifted to his adversary; or the adversary has a significantly heavier burden than he had in the first action."); REST. 2D JUDG. § 28(4), cmt f ("To apply issue preclusion in the cases described in Subsection (4) would be to hold, in effect, that the losing party in the first action would also have lost had a significantly different burden be[en] imposed . . . Since the process by which the issue was adjudicated cannot be reconstructed on the basis of a new and different burden, preclusive effect is properly denied. This is a major reason for the general rule that, even when the parties are the same, an acquittal in a criminal proceeding is not conclusive in a subsequent civil action arising out of the same event.").

[15] The Plaintiff failed to respond to Defendants' motion for summary judgment insofar as the motion addresses the merits of Plaintiff's action under the Free Exercise Clause. Instead, Plaintiff only asserts that collateral estoppel applies. Despite this, the Court still nonetheless addresses the merits of the claim.

In Smith, the Supreme Court held that the Free Exercise Clause does not inhibit enforcement of otherwise valid laws of general application that incidentally burden religious conduct. Id. at 878-82, 110 S. Ct. 1595. The Court held that the Free Exercise Clause did not bar the State of Oregon from enforcing its blanket ban on peyote possession with no allowance for sacramental use of the drug. The Court rejected the argument that the balancing test set forth in Sherbert v. Verner, 374 U.S. 398, 83 S. Ct. 1790, 10 L. Ed. 2d 965 (1963), which instructs that governmental actions that substantially burden a religious practice must be justified by a compelling governmental interest, should apply.

Congress responded to Smith by passing the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb et seq. RFRA prohibited governments from "substantially burdening" a person's exercise of religion even if the burden results from a rule of general applicability unless the government can demonstrate the burden (1) is in the furtherance of a compelling governmental interest; and (2) the least restrictive means of furthering that compelling governmental interest.[16] "[U]niversal" in its coverage, RFRA "applie[d] to all Federal and State law," see former § 2000bb-3(a), but notably lacked a Commerce Clause underpinning or a Spending Clause limitation to recipients of federal funds. The Supreme Court examined RFRA in City of Boerne v. Flores, 521 U.S. 507, 117 S. Ct. 2157, 138 L. Ed. 2d 624 (1997). The Court in Flores invalidated RFRA as applied to

---

[16] In Diaz v. Collins, 872 F. Supp. 353 (E.D. Tex. 1994), the court examined grooming regulations and religious beliefs in light of RFRA. Even under the then-applicable heighted standard found in RFRA, the court found that hair regulations did not violate RFRA, and the Fifth Circuit affirmed the decision, see Diaz v. Collins, 114 F.3d 69 (5th Cir. 1997), finding that prison regulations on hair length are *related to security and involve a compelling state interest.*

States and their subdivisions, holding that the Act exceeded Congress' remedial powers under the Fourteenth Amendment. Id. at 532-536, 117 S. Ct. 2157.[17]

As Defendants points out, while Smith involved a generally applicable criminal law, the principles driving the rationale and holding in Smith have been applied outside of the criminal law context to laws, rules, and policies that are neutral and of general applicability. For example, in Seabrook v. City of New York, 210 F.3d 355, 2000 WL 349276, at *1-*2 (2d Cir. 2000), the Second Circuit encountered a case very similar to this one. There, the district court had denied the plaintiffs' motion for a preliminary injunction seeking to enjoin the defendants from enforcing a new Department of Correction directive that forbid correction officers from wearing skirts while on duty. The plaintiffs alleged that the directive, by requiring them to wear pants in contravention of their religious faith, violated the Free Exercise Clause, as well as Article I § 3 of the New York State Constitution. The Second Circuit held that the plaintiffs could not show serious questions going to the merits, reasoning as follows:

> It is not a violation of the Free Exercise Clause to enforce a generally applicable rule, policy, or statute that burdens a religious practice, provided the burden is not the object of the law but merely the "incidental effect" of an otherwise valid neutral provision. See Employment Div., Dep't of Human

---

[17] The Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA") 114 Stat. 804, 42 U.S.C. § 2000cc-1(a)(1)-(2), enacted subsequent to RFRA, is not at issue here. However, as background information, the Court notes that Congress responded to the Supreme Court's decision in Flores by enacting RLUIPA. This enactment is far less sweeping than RFRA. It invokes federal authority under the Spending and Commerce Clauses, targeting two areas: Section 2 concerns land-use regulation, 42 U.S.C. § 2000cc, and Section 3 relates to religious exercise by institutionalized persons, § 2000cc-1. The Supreme Court, in Cutter v. Wilkinson, 544 U.S. 709, 125 S. Ct. 2113, 161 L. Ed. 2d 1020 (2005) held that Section 3 of RLUIPA does not violate the Establishment Clause.

Resources of Oregon v. Smith, 494 U.S. 872, 878-79 (1990). Thus, we have repeatedly refused to find free exercise violations where the laws or rules at issue "do not bar any particular religious practice," Bronx Household of Faith v. Community School Distr. No. 10, 127 F.3d 207, 216 (2d Cir. 1997), or where the plaintiff does not even allege that the rule targets or was motivated to prohibit certain religious beliefs, see, e.g., United States v. Amer, 110 F.3d 873, 878 (2d Cir. 1997). The plaintiffs do not allege a discriminatory purpose for the Directive, and the District Court's finding that the Directive "clearly does not, on its face, implicate the plaintiffs' free exercise rights, and in fact, only incidentally burdens those right," is correct and fatal to the plaintiffs' federal claim.

Id., at *1.[18] The Second Circuit in Seabrook went even further and found that,

even under the compelling interest test arguably applicable to the plaintiffs' free exercise claim under the New York State Constitution, see Matter of Miller, 252 A.D.2d 156, 158-59, 684 N.Y.S.2d 368, 370 (4th Dep't 1998) . . ., the preliminary injunction was properly denied. The compelling interest test asks (1) whether a sincerely held religious belief (not disputed here) is burdened by government action and, if so, (2) whether the State has demonstrated that the government conduct at issue "serves a compelling state interest, pursued by the least restrictive means possible, and that such an interest would be adversely affected by granting an exemption thereto." Rourke v. New York State Dep't of Correctional Servs., 159 Misc.2d 324, 328, 603 N.Y.S.2d 647, 650 (Sup.Ct. Albany Co.1993), aff'd, 201 A.D.2d 179, 615 N.Y.S.2d 470 (3d Dep't 1994). The District Court's findings that DOC has a compelling interest in the security and safety of its Correction Officers and inmates, and that, on this record, all Correction Officers are subject to duties which implicate DOC's proffered security rational for the Directive, were not an abuse of discretion. Thus, we affirm the denial of the injunction even under a compelling interest scrutiny.

Id., at *2.

---

[18] While the Second Circuit's analysis came at a different procedural point in the litigation (preliminary injunction) than this case (summary judgment), this does not affect – or take away from – the court's rationale as it relates to the *merits* of Plaintiff's free exercise claim.

After the plaintiffs' preliminary injunction motion was denied, the defendants in Seabrook moved, pursuant to Federal Rule of Civil Procedure 12(c), for a judgment on the pleadings or, in the alternative, summary judgment pursuant to Rule 56. See Seabrook v. City of New York, 2001 WL 40767 (S.D.N.Y. Jan. 16, 2001). The district court dismissed all of the plaintiffs' claims under the First and Fourteenth Amendments, quoting Smith and noting that "[t]he Free Exercise Clause of the First Amendment does not relieve individuals of their obligation to comply with valid laws of general applicability." Id., at *2; see also Flores, 521 U.S. at 535, 117 S. Ct. 2157 ("When the exercise of religion has been burdened in an incidental way by a law of general application, it does not follow that the persons affected have been burdened any more than other citizens, let alone burdened because of their religious beliefs.").

The Seabrook court then addressed an additional argument and, while the Plaintiff here fails to advance such an argument, it is still relevant to this action. The plaintiffs in Seabrook argued that Smith and Flores were not applicable because the directive forbidding correctional officers from wearing skirts was not a law or a regulation, but instead a workplace rule. The court rejected the plaintiffs' argument, relying in part on the Supreme Court's decision in Kelley v. Johnson, 425 U.S. 238, 96 S. Ct. 1440, 47 L. Ed. 2d 708 (1976), where the Court held that "[c]hoice of organization, dress, and equipment for law enforcement personnel is a decision entitled to the same sort of presumption of legislative validity as are state choices designed to promote other aims within the cognizance of the State's police power." The Court in Kelley upheld a county regulation limiting the length of a policeman's hair and, in so doing, the Court acknowledged that it had already sustained "comprehensive

and substantial restrictions upon activities of both federal and state employees lying at the core of the First Amendment." Kelley, 425 U.S. at 245, 96 S. Ct. 1440 (citing United States Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, 413 U.S. 548, 93 S. Ct. 2880, 37 L. Ed. 2d (1973); Broadrick v. Oklahoma, 413 U.S. 601, 93 S. Ct. 2908, 37 L. Ed. 2d 830 (1973)); see also Riggs v. City of Forth Worth, 229 F. Supp. 2d 572, 581 (N.D. Tex. 2002) ("Courts have long held that the city through its police chief has the right to promote a disciplined, identifiable, and impartial police force by maintaining its police uniform as a symbol of neutral government authority, free from expressions of personal bent or bias.") (internal quotations omitted).

While the interest claimed to have been protected in Kelley was a liberty interest under the Fourteenth Amendment, the Court referred to a balancing of the interests analysis which was originally formulated in the First Amendment arena and is set forth in Pickering v. Board of Education, 391 U.S. 563, 568, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968). The Kelley Court further observed the hair-length rule could not be examined in isolation, but instead must be viewed "in the context of the county's chosen mode of organization for its police force." 425 U.S. at 247, 96 S. Ct. 1440. Uniform hair-length, like similarity in appearance and conduct, was believed by the police force to be an important factor in establishing a desired measure of discipline and *esprit de corps*. The Supreme Court held that such consideration was permissible for a paramilitary organization like a police force and determined that the regulation was a reasonable exercise of administrative discretion. Id.

The Seabrook court went on to note that "the Smith decision has been relied upon in upholding neutral governmental safety regulations that interfere with public employees' First

16

Amendment rights to freely exercise their religion." <u>Seabrook</u>, 2001 WL 40767, at \*4. As such, the district court granted summary judgment to the defendants, noting that the directive forbidding skirts was a neutral rule of general applicability and did not implicate the plaintiffs' free exercise rights. <u>Id.</u>

Along the same lines as those followed in <u>Seabrook</u>, in <u>Kalsi v. New York City Transit Authority</u>, 62 F. Supp. 2d 745, 761 (E.D.N.Y. 1998), the plaintiff, a member of the Sikh religion, challenged the defendant's policy of requiring its car inspectors to wear Transit Authority- provided hard hats. As a Sikh, the plaintiff was required to wear a turban on his head at all times, other than when sleeping or bathing. The turban effectively prevented the plaintiff from wearing the required hard hat. The plaintiff refused to comply with management's requests and was terminated, later filing suit under the First Amendment. In granting summary judgment for the defendant, the <u>Kalsi</u> court – citing <u>Smith</u> – found that "it is not a violation of the Free Exercise Clause to enforce a generally applicable *rule, policy*, or statute that burdens a religious practice." <u>Id.</u> at 761 (emphasis added).

More importantly, the Fifth Circuit has applied <u>Smith</u> to a free exercise challenge. <u>See</u> <u>Daniels v. City of Arlington</u>, 246 F.3d 500, 505 (5th Cir. 2001). In <u>Daniels</u>, a city police officer was terminated for insubordination after he refused to stop wearing a gold cross pin on his uniform. The officer sued the city and its police chief, alleging that the police department's "no pins" policy violated the First Amendment and that he was the victim of religious discrimination under Title VII.[19] The police officer moved for partial summary judgment, and the defendants moved for summary judgment. The district court denied the

_____

[19] The Court discusses the Title VII claim raised in <u>Daniels</u> in more detail below.

officer's motion and granted the defendants' motions. On appeal, the Fifth Circuit held that the policy did not violate the First Amendment. The Fifth Circuit, citing to <u>Smith</u>, reasoned as follows:

> The [district] court [ ] found that the no-pins policy is facially neutral and generally applicable, and only incidentally burdens Daniels's free exercise of his religion. Therefore, concluded the court, the rule is acceptable under the teaching of <u>Employment Div., Dep't of Human Resources of Oregon v. Smith</u>.
>
> On appeal, Daniels appears to focus on a single sentence in which the district court stated: "Plaintiff's argument that wearing a cross on his police uniform is mandated by his religion is wholly without merit" Daniels is correct in arguing that it is improper for a court to assess what activities are mandated by religious belief . . . Even if the court's perhaps-unfortunate phrasing allows for Daniel's interpretation, however, it does not undercut the validity of the conclusion that the no-pins policy does not target religion but only incidentally affects Daniels's individual religious practice, and thus is acceptable under <u>Smith</u>.

<u>Id.</u> at 505; <u>see</u> <u>also</u>, <u>e.g.</u>, <u>Jacobs v. Clark Cnty School Dist.</u>, 526 F.3d 419, 439 (9th Cir. 2008) (applying <u>Smith</u> to free exercise claim).

Here, like in <u>Daniels</u>, the pants-only policy does not, on its face, implicate Plaintiff's free-exercise rights. It is facially neutral and generally applicable and, given Plaintiff's failure to respond to the merits of Defendants' motion for summary judgment on free exercise grounds, Plaintiff provides no competent evidence to suggest otherwise. Further, the policy does not target religion and, as the court found in <u>Seabrook</u>, it only incidentally affects Plaintiff's individual religious practice. Thus, this case differs from <u>Booth v. Maryland</u>, 327 F.3d 377 (4th Cir. 2003). In that case, a correctional officer and practicing member of the Rastafarian religion brought an action against the State of Maryland, alleging that his civil rights were violated when he was subjected to disciplinary action for wearing his hair in

modified dreadlocks in violation of the dress code and grooming policy. The district court entered summary judgment in favor of the state defendant, and the Fourth Circuit affirmed in part, reversed in part, and remanded. Relevant here is the claim in <u>Booth</u> brought under the Free Exercise Clause. The court began by citing and applying <u>Smith</u>'s rationale. The Fourth Circuit upheld the district court's conclusion that "there was 'no indication, either from their language or effect, that the rules that Booth challenge[d] as violative of his rights were targeted at Rastafarians or members of other religious groups' . . . and that [the rules] were 'rationally related to the division's legitimate interests in public safety, discipline and esprit de corps.'" <u>Id.</u> at 381 (quoting district court) (internal citations omitted). The Fourth Circuit recognized that the policy "does not discriminate on its face[,] . . is applicable to all uniformed correctional staff of the Division, regardless of race or religious affiliation[, and] [t]here is no evidence that the Division developed the policy to regulate or prohibit religious activities, including Booth's practice of Rastafarianism. . . ." <u>Id.</u> at 381. However, the Fourth Circuit went on to point out why the district court erred in its constitutional conclusion. The court noted as follows:

> The district court erred, however, in ending the inquiry here. Booth's claim is that the facially neutral policy is being applied in a discriminatory manner because the Division has granted religious exemptions to others who were similarly situated to him. At a minimum, Booth presented at least some evidence that the legitimate secular purposes underlying the policy have been abandoned in a manner that favors other religions over his religion and, therefore, that the policy has been applied to him in an unconstitutional manner.

<u>Id.</u> In the present case, unlike <u>Booth</u> and other cases of comparable distinction, Plaintiff presented no evidence that the JDC policy was applied in a discriminatory manner. That is,

Plaintiff failed to present any evidence that exceptions to the "pants-only" policy have been made based on religious reasons for other detention officers.[20]  For these reasons, the Court concludes that the policy does not infringe upon Plaintiff's free exercise rights, and it passes constitutional muster under Smith.

While Plaintiff never asserts that the standard set forth in Smith does not apply, the Court would nonetheless find the policy at issue here constitutional even if Defendants were required to justify the policy by a compelling governmental interest. See Seabrook, 2000 WL 349276, at *2.  Yet, the Court notes that, even if the JDC policy was not facially neutral in regards to religion, numerous courts have retreated from the typical strict scrutiny review to adopt some other less rigorous analytical framework in public employment free exercise cases, recognizing the distinction that "the government as employer [ ] has far broader powers than does the government as sovereign," enjoying a "freer hand in regulating the speech of its employees than it has in regulating the speech of the public at large." Waters v. Churchill, 511 U.S. 661, 671, 114 S. Ct. 1878, 128 L. Ed. 2d 686 (1994).  For example, the Third Circuit has applied an intermediate level of scrutiny – requiring the government action to be substantially related to an important governmental interest – in the public employment context. Fraternal Order of Police Newark Lodge No. 12 v. City of Newark, 170 F.3d 359, 365-66 n.7 (3d Cir. 1999); see also Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly, 309 F.3d 144, 166 n.27 (2002) (citing Fraternal Order of Police).  Other courts have applied the Pickering balancing test used in public employment free speech jurisprudence. See, e.g., Brown v. Polk County,

---

[20] Plaintiff, under her Title VII claim, asserts that administrative staff, including a plain-clothes detective, are allowed to wear skirts. These individuals, however, hold different positions than plaintiff – they are not part of the detention staff.

Iowa, 61 F.3d 650, 658 (8th Cir. 1995) (en banc); *cert. denied*, 516 U.S. 1158, 116 S. Ct. 1042, 134 L. Ed. 2d 189 (1996) ("[Pickering] dealt with free speech rather than the free exercise of religion, but because the analogy is such a close one, and because we see no essential relevant differences between those rights, we shall endeavor to apply the principles of Pickering to the case at hand."); Baz v. Walters, 782 F.2d 701, 708 (7th Cir. 1986); Shahar v. Bowers, 836 F. Supp. 859, 866 (N.D. Ga. 1993), *aff'd*, 114 F.3d 1097 (11th Cir. 1997) (en banc); Shatkin v. Univ. of Texas at Arlington, 2009 WL 614788, at *7 (N.D. Tex. 2009); Draper v. Logan Cnty. Public Library, 403 F. Supp. 2d 608 (W.D. Ky. 2005).

A Pickering-like balancing test has also been used in several other employment contexts, including situations involving the right of expressive association, see Hatcher v. Board of Public Education, 809 F.2d 1546, 1559 (11th Cir. 1987); the right of intimate association, see Shahar v. Bowers, 114 F.3d 1097, 1103 (11th Cir. 1997) (en banc); the right to petition, see White Plains Towing Corp. v. Patterson, 991 F.2d 1049, 1059 (2d Cir. 1993); and Fourteenth Amendment privacy rights, see Fyfe v. Curlee, 902 F.2d 401, 405 (5th Cir. 1990); Stough v. Crenshaw County Board of Education, 744 F.2d 1479, 1481 (11th Cir. 1984). As the court in Draper noted, "[t]his varied application reveals that the government's role as an employer transcends many specific areas of constitutional jurisprudence to categorically lower the government's burden in cases challenging its actions as an employer." 403 F. Supp. 2d at 623. Similarly, while the Supreme Court has never explicitly addressed the level of scrutiny applicable to governmental regulation of employee free expression, the Court has applied a less rigorous test to a religion-neutral military dress regulation challenged

on free exercise grounds. See Goldman v. Weinberger, 475 U.S. 503, 106 S. Ct. 1310, 89 L. Ed. 2d 478 (1986).

In Goldman, an Air Force officer challenged a military regulation that, by forbidding headgear from being worn indoors with the military uniform, prohibited him from wearing a yarmulke while in uniform. Id. at 505, 106 S. Ct. 1310. The Court, based upon the tenet that judicial "review of military regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations designed for civilian society," opined that "courts must give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest." Id. at 507, 106 S. Ct. 1310. It then gave such deference to the "considered professional judgment" of the Air Force that uniformity in military uniforms and eliminating individual distinctions except for military rank were vital to troop obedience, unity, commitment, discipline, and *esprit de corps*. Id. While not directly on point, the Goldman holding lends further support to the premise that a more relaxed free exercise measurement is likely appropriate when the government regulates conduct not of its citizens as a sovereign, but of its employees as an employer.

As noted above, even if an analysis such as the Pickering balancing test[21] applied to this action, JDC's uniform policy would still survive constitutional muster. In Daniels, the

---

[21] The Pickering "test" is essentially as follows:

1. A public employee has a protected right under the First Amendment to comment on "matters of public concern." See Garcetti v. Ceballos, 547 U.S. 410, 126 S. Ct. 1951, 164 L. Ed. 2d 698 (2006) (holding that when public employees make statements pursuant to their official duties, they are not

Fifth Circuit held that a police officer's act of wearing a small gold cross pin on his uniform, even if it could be construed as speech involving public concern, could not survive the Pickering balancing analysis. 246 F.3d at 504. The Daniels court based its decision on the unique need for impartiality and uniformity in law enforcement officers and the facially-neutral prohibition on wearing decorations on a police uniform shirt. Here, the concern is even greater than in Daniels. Not only does the "pants-only" policy raise concerns of impartiality and uniformity,[22] but it is also neutral, generally applicable, and serves to

---

speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline).

2. If the employee's comments are not on a "matter of public concern," those comments are not protected. While there are multiple tests to determine whether speech is of public concern, the Fifth Circuit has "used two tests, both derived from Connick v. Myers, 461 U.S. 138, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983), to determine whether speech relates to a 'legitimate public concern.'" Daniels, 246 F.3d at 503-04. The first, the citizen-employee test, turns on whether a public employee "'speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest.'" The second evaluates the content, form, and context of a given statement. Kennedy v. Tangipahoa Parish Library Bd. of Control, 224 F.3d 359, 366 (5th Cir. 2000) (quoting Connick, 461 U.S. at 147, 103 S. Ct. 1684).

3. If the employee's comments are on a matter of public concern, then the burden shifts to the employer to demonstrate that the speech would potentially interfere with or disrupt the government's activities, and can persuade the court that the potential disruptiveness outweighs the employee's First Amendment rights. That is, the Pickering standard balances "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interests of the State, as employer, in promoting the efficiency of the public services it performs through its employees." Pickering, 391 U.S. at 568, 88 S. Ct. 1731.

The Court here focuses only on the last part of Pickering (i.e., the actual "balancing" test).

[22] The Fifth Circuit has held that "a uniform requirement fosters discipline, promotes uniformity, encourages esprit de corps, . . . increases readiness . . . and encourages the

maintain JDC's interest in safety and security.[23]  More specifically, Defendants presented evidence of a legitimate and critical concern that an officer in a skirt would be unable to properly perform certain defensive or restraint maneuvers which are taught to detention officers and would hinder the ability to chase a feeling detainee.[24]  Given this, the Court concludes that, even if a stricter standard was applied in this action, the Plaintiff's free exercise challenge would still fail.  Accordingly, Defendants are entitled to summary judgment as to this claim.

C.  Gender Discrimination Under Title VII

Under Title VII, it is "an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  Plaintiff contends that she was discriminated based on her gender under Title VII due to the JDC

_____

subordination of personal preferences and identities in favor of the group mission." Communications Workers of America v. Ector Cnty. Hosp. Dist., 467 F.3d 427, 439 (5th Cir. 2006).

[23] In weighing competing interests, courts have "given substantial weight to government employers' reasonable predictions of disruption." Waters v. Churchill, 511 U.S. 661, 673, 114 S. Ct. 1878, 128 L. Ed. 2d 686 (1994). Yet, the government must still demonstrate that the danger to its operation is real, and that its restriction will alleviate this danger in a direct and material way. United States v. Nat'l Treasury Employees Union, 513 U.S. 454, 475, 115 S. Ct. 1003, 130 L. Ed. 2d 964 (1995). But, a governmental entity "may impose restraints . . . that would be plainly unconstitutional if applied to the public at large." Id. at 465, 115 S. Ct. 1003.

[24] Defendants presented, among other evidence, a declaration and expert report of Monica McKenzie, the assistant director and training coordinator of the Cullman County Juvenile Detention Center in Cullman, Alabama, and a certified instructor of the Strategic Self-Defense and Grappling Tactics curriculum. Defendants also presented the deposition testimony of Tim Erickson, who is the school resource officer and part of the training staff at the Lee County Sheriff's Department.

uniform policy. According to Plaintiff, the policy is discriminatory because males are permitted to wear their "traditional" garb (i.e., pants), yet females are prohibited from wearing their "traditional" garb (i.e., dresses/skirts). Plaintiff does not seek to prove her case with direct evidence, instead presenting alleged circumstantial evidence and analyzing her claim under McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

Under the McDonnell Douglas standard, Plaintiff must first establish a prima facie case of discrimination by establishing (1) that she was a member of a protected group; (2) qualified for the position she held; (3) that she suffered an adverse employment decision; and (4) was either replaced by someone outside the protected group or treated less favorably than employees not in the protected group. Okoye v. Univ. of Tex. Houston Health Sci. Ctr., 245 F.3d 507, 513 (5th Cir. 2001). Proof of disparate treatment can establish the fourth element of the plaintiff's prima facie case. See Bryant v. Compass Group USA Inc., 413 F.3d 471, 478 (5th Cir. 2005).

Once a plaintiff has made her prima facie case, the defendant then has the burden of producing a legitimate, nondiscriminatory motive for the adverse employment action. Parker v. State of La. Dep't of Educ. Special Sch. Dist., 323 F. App'x 321, 327 (5th Cir. 2009). The defendant's burden at this stage is merely one of production-not persuasion. Id.

If the defendant can articulate a reason that, if believed, would support a finding that the action was nondiscriminatory, then the inference of discrimination created by the plaintiff's prima facie case disappears, and the factfinder must decide the ultimate question of whether the plaintiff has proven intentional discrimination. St. Mary's Honor Ctr. v. Hicks,

509 U.S. 502, 511-12, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993). The plaintiff must present substantial evidence that the employer's proffered reason is a pretext for discrimination. Laxton v. Gap, Inc., 333 F.3d 572, 578 (5th Cir. 2003). To show pretext on summary judgment, "the plaintiff must substantiate his claim of pretext through evidence demonstrating that discrimination lay at the heart of the employer's decision." Price v. Fed. Express Corp., 283 F.3d 715, 720 (5th Cir. 2002).

Pretext may be established "either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or 'unworthy of credence.'" Laxton, 333 F.3d at 578 (quoting Reeves, 530 U.S. at 143, 120 S. Ct. 2097). "To raise an inference of discrimination, the plaintiff may compare his treatment to that of nearly identical, similarly situated individuals." Bryant v. Compass Group USA Inc., 413 F.3d 471, 478 (5th Cir. 2005). To establish disparate treatment, however, a plaintiff must show that the employer gave preferential treatment to another employee under "nearly identical" circumstances. Id. Alternatively, "[a]n explanation is false or unworthy of credence if it is not the real reason for the adverse employment action." Laxton, 333 F.3d at 578.

In contrast, the Fifth Circuit has modified the McDonnell Douglas formulation to permit proof that discrimination was one motivating factor among others for an adverse employment action. See generally Rachid v. Jack in the Box, Inc., 376 F.3d 305 (5th Cir. 2004). At one time, the Fifth Circuit required that a plaintiff present direct evidence of discrimination in order to receive the benefit of a mixed-motive analysis. See Fierros v. Tex. Dep't of Health, 274 F.3d 187, 191 (5th Cir. 2001). However, the Supreme Court in Desert Palace, Inc. v. Costa held that Congress's failure to require a heightened burden of proof

suggested that courts should not depart from the general rule of civil litigation that "requires a plaintiff to prove his case 'by a preponderance of the evidence,' using 'direct or circumstantial evidence.'" 539 U.S. 90, 99, 123 S. Ct. 2148, 156 L. Ed. 2d 84 (2003) (quoting Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 714 n. 3, 103 S. Ct. 1478, 75 L. Ed. 2d 403 (1983)). Therefore, a plaintiff asserting a Title VII discrimination claim may utilize the mixed-motive analysis whether she has presented direct or circumstantial evidence of discrimination. Id. at 101, 123 S. Ct. 2148; Smith v. Xerox Corp., 602 F.3d 320, 327-28 (5th Cir. 2010).

At the outset, the Court notes that the parties' views diverge with regard to what is needed to make a prima facie case of gender discrimination as applied to this action. Plaintiff, at times, appears to only focus on the particular mandates of the uniform policy, asserting that it itself is discriminatory because female detention officers are required to wear traditional male attire (pants) as opposed to traditional female attire (skirts).[25] Defendants, on the other hand, contend that Plaintiff has "veered from the correct path of analysis" by focusing on the policy. According to Defendants, "the issue for the prima facie case is whether the plaintiff was treated less favorably than males *with respect to the termination decision*," as opposed to the policy. Because both the policy and the termination could (of course) be discriminatory, the Court analyzes all arguments, as well as any way Defendants' actions and policies could infringe upon Plaintiff's rights.

---

[25] However, Plaintiff does analyze the termination claim, as she asserts that it is the adverse employment action at issue.

*The Termination Decision*

As to the termination decision, Plaintiff cannot demonstrate a violation of Title VII. Plaintiff is undisputedly a qualified female who suffered an adverse employment decision. However, Plaintiff cannot meet the fourth prong of a prima facie case. That is, she cannot show she was replaced by someone outside her protected class, or that she was treated less favorably than other employees with regards to Defendants' decision to terminate Plaintiff's employment. In fact, Plaintiff does not even attempt to do so, instead stating that she was treated less favorably because she was required to wear traditional male attire. While the Court addresses Plaintiff's argument concerning any gender-motivated discriminatory animus in the adoption of the uniform policy below, the analysis required to show gender discrimination in the termination decision is to show that Plaintiff, as a female, was treated less favorably than other employees with respect to the actual termination. There is no evidence that any males, or even any other females, were not terminated for refusing to comply with the tenets of the JDC policy. In other words, there is no evidence that another employee was treated more favorably than Plaintiff for engaging in similar conduct, and Plaintiff appears to concede that she was not replaced with someone outside of her protected class. Additionally, Plaintiff presents no other existing evidence raising an inference of discrimination with respect to her termination and, as such, Plaintiff has failed to establish a prima facie case of discrimination.

Nevertheless, because the required prima facie showing is a "flexible evidentiary standard" that was "never intended to be rigid, mechanized, or ritualistic," see Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002), the Court

analyzes the remainder of the analytical framework set forth in <u>McDonnell Douglas</u>. Once the plaintiff has met its prima facie case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its decision. Here, Defendants' legitimate, nondiscriminatory reason for terminating Plaintiff's employment is that Plaintiff refused to follow the JDC uniform policy.[26] This articulated reason satisfies Defendants' burden of production.

The burden, therefore, shifts back to Plaintiff to prove either that this proffered reason is pretext for discrimination or that Plaintiff's protected characteristic was a motivating factor for the decision. Plaintiff fails to meet such a burden. In fact, because Plaintiff focuses on "safety and security," as opposed to Defendants' actual articulated reason of failure to comply with the policy, Plaintiff's brief strays from the proper analysis. The governing standard here is whether the evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited discrimination occurred. <u>See</u> <u>Reeves</u>, 530 U.S. at 150, 120 S. Ct. 2097. Factors to be considered "'include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation [for the adverse employment action] is false, and any other evidence that supports [or undermines] the employer's case.'" <u>James v. New York Racing Ass'n</u>, 233 F.3d 149, 156 (2d Cir. 2000) (quoting <u>Reeves</u>, 530 U.S. at 148-49, 120 S. Ct. 2097). Here, there is simply no evidence anywhere in the record that could support an inference of gender discrimination with respect to Defendants' decision to terminate Plaintiff.

---

[26] Plaintiff asserts that Defendants' legitimate, nondiscriminatory reason is "safety and security." This statement is flawed. Defendants' articulated reason for the termination has always been Plaintiff's failure to comply with the policy. "Safety and security" are the reasons fueling Defendants' adoption of the policy.

*The Uniform Policy*

The majority of Plaintiff's claim appears to focus solely on the uniform policy itself. The policy requires both males and females to wear pants. It is important to note that Plaintiff's only argument is that the policy denies females the right to wear "traditional garb" in the form of a skirt.[27] Thus, the policy – unlike most cases brought alleging discrimination based on uniform policies – does *not* differentiate between males and females. The Court is unaware of any case where a policy that deprives a gender from wearing what he or she defines as "traditional" attire has been held per se discriminatory.[28] In fact, even uniform policies and/or grooming standards that vary between genders have been routinely upheld by courts.[29]

The state of the law governing sex-based "grooming standards" was aptly summarized by the Eighth Circuit in Knott v. Missouri Pac. Ry. Co., 527 F.2d 1249, 1252 (8th Cir.1975),

---

[27] Plaintiff analyzes her claim only under McDonnell Douglas as a "traditional" gender discrimination claim. However, many of Plaintiff's arguments sound like arguments usually made either under a disparate impact theory or "sex stereotyping" under Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989). As such, the Court takes all of these arguments into account and concludes that Plaintiff has failed to prove a claim of disparate treatment, disparate impact, or sex stereotyping.

[28] If anything, requiring a female to wear what one could define as "traditional garb" could potentially be a violation of Title VII under Price Waterhouse. This is discussed in more detail *infra*.

[29] This by no means is to say that such policies, including even-handed requirements like the one at issue here, are beyond the purview of Title VII. As one court has noted, "[i]t is not impossible to imagine a situation in which a frivolous appearance guideline so disparately impacts a protected class that a jury could infer from the existence of that situation alone that the employer adopted the guideline as a subterfuge for discrimination." Eatman v. United Parcel Service, 194 F. Supp. 2d 256, 264 (S.D.N.Y. 2002) (granting summary judgment to employer and noting that plaintiff had "neither shown that the policy severely impacts African-Americans as a class, nor presented any evidence that the policy lacks a legitimate business purpose").

where the court held that "minor differences in personal appearance regulations that reflect customary modes of grooming do not constitute sex discrimination within the meaning of § 2000e–2." Title VII "was never intended to interfere in the promulgation and enforcement of personal appearance regulations by private employers." Id. at 1251–52. The rationale for this conclusion is that if such policies are not designed as a pretext to exclude either sex from employment, slight differences in grooming standards have "only a negligible effect on employment opportunities." Id.

In a series of cases similar to Knott, other courts addressing this question have arrived at a similar result. See, e.g., Willingham v. Macon Tel. Pub. Co., 507 F.2d 1084 (5th Cir. 1975) (concluding that a grooming policy concerning hair length differences for males and females did not constitute sex discrimination and noting that such a policy relates "more closely to the employer's choice of how to run his business than to equality of employment opportunity"); Jespersen v. Harrah's Operating Co., Inc., 444 F.3d 1104, 1109-10 (9th Cir. 2006) (en banc) (holding that Harrah's grooming standards requiring women to wear makeup and styled hair and men to dress conservatively was not discriminatory because the policy did not impose unequal burdens on either sex); Nichols v. Azteca Rest. Enters., Inc., 256 F.3d 864, 875 n.7 (9th Cir. 2001) (explaining that reasonable regulations concerning dress and grooming standards do not necessarily constitute actionable discrimination under Title VII); Harper v. Blockbuster Entertainment Corp., 139 F.3d 1385, 1387 (11th Cir. 1998) (grooming policy prohibiting men, but not women, from wearing long hair does not violate Title VII); Bellissimo v. Westinghouse Electric Corp., 764 F.2d 175 (3d Cir. 1985), cert. denied, 106 S.Ct. 1244 (1986) (dress codes permissible although specific requirements for males and

females may differ); <u>Barker v. Taft Broadcasting Co.</u>, 549 F.2d 400 (6th Cir. 1977) (a different hair grooming standard for men than for women does not give rise to a Title VII claim); <u>Fountain v. Safeway Stores, Inc.</u>, 555 F.2d 753, 755 (9th Cir. 1977) ("regulations promulgated by employers which require male employees to conform to different grooming and dress standards than female employees is not discrimination within the meaning of Title VII"); <u>Earwood v. Continental Southeastern Lines, Inc.</u>, 539 F.2d 1349 (4th Cir. 1976) (sex-differentiated grooming regulation not used as pretext to exclude either sex from employment is not within Title VII's purview); <u>Fagan v. National Cash Register Co.</u>, 481 F.2d 1115 (D.C. Cir. 1973) (distinction between sexes vis-à-vis grooming standards does not constitute Title VII violation);[30] <u>Capaldo v. Pan American</u>, 1987 WL 9687, at *2 (E.D.N.Y. Mar. 30, 1987) (holding that terminating a male employee for refusing to remove an earring does not state a claim for sex discrimination);

The "pants-only" dress code here applies to all employees equally; it does not single out males or females. Thus, it stands in stark contrast to cases where a violation of Title VII

---

[30] The Court in <u>Fagan</u>, like other courts considering this issue, took a realistic and commonsense approach. For example, the court stated:

> Perhaps no facet of business life is more important than a company's place in public estimation. That the image created by its employees dealing with the public when on company assignment affects its relations is so well known that we may take judicial notice of an employer's proper desire to achieve favorable acceptance. Good grooming regulations reflect a company's policy in our highly competitive business environment. Reasonable requirements in furtherance of that policy are an aspect of managerial responsibility.

481 F.2d at 1125-25; <u>see also</u> <u>Burdine</u>, 450 U.S. at 259, 101 S. Ct. 1089 (noting that Title VII "was not intended to diminish traditional management prerogatives"); <u>Lanigan v. Bartlett & Co. Grain</u>, 466 F. Supp. 1388, 1392 (W.D. Mo. 1979) ("Employment decisions . . . based on either dress codes or policies . . . are more closely related to the company's choice of how to run its business. . . .").

has been found due to a dress code policy distinguishing between male and female attire with respect to uniform regulations. See Carroll v. Talman Fed. Sav. And Loan Ass'n of Chicago, 604 F.2d 1028, 1031 (7th Cir. 1979). In Carroll, a bank required its female tellers, officer and managerial employees to wear a uniform while male employees working in the same positions were required only to wear customary business attire. The employer expressly maintained that the purpose of the uniform requirement was to reduce fashion competition among women. Id. at 1031. Since men (apparently) do not engage in such competition, they do not need a uniform requirement. Id. The Seventh Circuit held that personal appearance regulations with differing requirements for men and women do not violate Title VII as long as there is "some justification in commonly accepted social norms and are reasonably related to the employer's business needs." Id. at 1032. However, an employer who imposes separate dress requirements for men and women performing the same jobs will violate Title VII when one sex can wear regular business attire and the other must wear a uniform. Id. Finding the uniform requirement demeaning to women, the Carroll court stated: "[w]hile there is nothing offensive about uniforms per se, when some employees are uniformed and others are not there is a natural tendency to assume that the uniformed women have lesser professional status than their colleagues attired in normal business clothes." Id. at 1033. Here, unlike Carroll, the uniform policy is applied even-handily; thus, it is valid under Title VII unless Plaintiff can further present sufficient evidence from which a rational jury could infer intentional discrimination. See, e.g., Etsitty v. Utah Transit Auth., 502 F.3d 1215, 1224-27 (10th Cir. 2007) (noting that employers cannot shield discrimination behind a presumably valid dress code and/or grooming policy).

33

The same <u>McDonnell Douglas</u> analysis as discussed above is equally applicable to Plaintiff's claim based on gender discrimination in the uniform policy. Plaintiff cannot meet the fourth prong of a prima facie case. The uniform policy applies evenly to all detention officers, and Plaintiff's only allegation is that the uniform policy prohibited her from wearing traditional female apparel. Plaintiff does not allege that she was replaced by someone outside her protected class, and she cannot otherwise demonstrate that she was treated less favorably than male employees,[31]  or any other employees, with regards to Defendants' decision to terminate Plaintiff's employment based on her refusal to comply with the "pants-only" requirement.

Yet, in <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989), the Supreme Court decided that sex stereotyping can violate Title VII when it influences employment decisions. In <u>Price Waterhouse</u>, a female senior manager was denied partnership, and partners involved in the decision making had referred to her as "'macho'" and in need of "'a course at charm school[.]'" 490 U.S. at 235, 109 S. Ct. 1775. She was advised that to become a partner she should "'walk more femininely, talk more femininely,

_____

[31] The Court notes that it is not holding that women alleging sex discrimination are *always* compelled to prove that men were not subjected to the same challenged discriminatory conduct or to show that the discrimination affected anyone other than herself. In fact, <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 80, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998) illustrates how an employee may prove an adverse employment action because of sex without evidence that employees of the opposite sex were treated differently. Oncale was part of an eight man ship crew, and he could not show any female crew were treated differently since there were none. <u>Id.</u> at 77, 118 S. Ct. 998. Evidence that he had been sexually harassed was nevertheless sufficient to support his Title VII claim because the harassment was *because of his sex*.  As the Court explained, "comparative evidence about how [an] alleged harasser treated members of both sexes" is only one "evidentiary route" to prove discrimination, but a harasser's "sex-specific and derogatory terms" can do the same. <u>Id.</u> at 80-81, 118 S. Ct. 998. Given this, the Court analyzes Plaintiff's gender discrimination claim in further detail.

dress more femininely, wear make-up, have her hair styled, and wear jewelry.'" Id. The Court found that such stereotypical attitudes violate Title VII if they lead to an adverse employment decision. Id. at 251, 109 S. Ct. 1775; id. at 259, 109 S. Ct. 1775 (White, J., concurring); id. at 272-73, 109 S. Ct. 1775 (O'Connor, J., concurring). The Price Waterhouse plurality's understanding that an employer might escape liability by showing that it would have made the same decision even without a discriminatory motive is no longer permissible because Congress provided otherwise, see 42 U.S.C. § 2000e-2(m), but the Court's conclusion that Title VII prohibits sex stereotyping endures. Other courts have upheld Title VII claims based on sex stereotyping subsequent to Price Waterhouse. See, e.g., Chadwick v. WellPoint, Inc., 561 F.3d 38 (1st Cir. 2009); Back v. Hastings On Hudson Union Free Sch. Dist., 365 F.3d 107 (2d Cir. 2004); Smith v. City of Salem, Ohio, 378 F.3d 566 (6th Cir. 2004); Nichols v. Azteca Rest. Enters., Inc., 256 F.3d 864 (9th Cir. 2001); Frank v. United Airlines, Inc., 216 F.3d 845, 855 (9th Cir.2000). And, even well before Price Waterhouse, courts had found sex specific impositions on women in customer service jobs illegal. Violations of Title VII occurred where a female lobby attendant was terminated for refusing to wear a sexually provocative uniform, see EEOC v. Sage Realty Corp., 507 F. Supp. 599, 607-608 (S.D.N.Y. 1981); where only women employees were compelled to wear uniforms, see Carroll v. Talman Fed. Sav. & Loan Ass'n of Chic., 604 F.2d 1028 (7th Cir. 1979); and where only female flight attendants were required to wear contact lenses instead of glasses, see Laffey v. Northwest Airlines, Inc., 366 F. Supp. 763, 790 (D.D.C. 1973), *aff'd in part, vacated and remanded in part on other grounds*, 567 F.2d 429 (D.C. Cir. 1976).

As the Sixth Circuit succinctly stated, "[a]fter <u>Price Waterhouse</u>, an employer who discriminates against women because, for instance, they do not wear dresses or makeup, is engaging in sex discrimination because the discrimination would not occur but for the victim's sex." <u>Smith</u>, 378 F.3d at 574. Here, however, Plaintiff simply produces no evidence that would allow a factfinder to conclude that the uniform policy is impermissible gender discrimination or proscribed sex stereotyping. Plaintiff has provided no support for the proposition that Defendants' legitimate, nondiscriminatory reason for Plaintiff's termination (.i.e., Plaintiff's refusal to comply with the policy) is either pretext or that Plaintiff's gender was a motivating factor in the decision. Further, the "pants-only" policy applies uniformly to all employees. <u>See</u> <u>Price Waterhouse</u>, 490 U.S. at 240, 109 S. Ct. 1775 (noting that Title VII requires that "gender must be *irrelevant* to employment decisions") (emphasis added). Thus, Defendants have done the exact opposite of what has generally been considered sex stereotyping that rises to the level of a violation under Title VII.[32]

---

[32] In support of their summary judgment motion on Plaintiff's gender discrimination claim, Defendants state as follows:

> In any event, the whole "traditional attire" argument is dubious. While pants may not have been "traditional" female attire in the 1960s, and dresses may have been de rigueur for Harriet Nelson and June Cleaver, since the 1970s the wearing of pants by women has become increasingly commonplace, and in current fashion pants are just as much women's clothing as they are men's clothing. The court can take judicial notice that it is now routine rather than unusual for women to wear pants . . . Counsel for defendants, on a recent Thursday, conducted an email survey of the women working for the firm to see if they were wearing pants or skirts. Of the 22 women who responded, 17 (77%) were wearing pants.

<u>See</u> Defendants' Rebuttal Brief in Support of Motion for Summary Judgment, at 17 & n.7. While the Court is appreciative of the history concerning the wearing of pants by women, it

However, as discussed *supra*, some of Plaintiff's arguments sound more like Plaintiff intended to proceed under a disparate impact theory of discrimination, as opposed to disparate treatment. Disparate impact claims are those claims which "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." Raytheon v. Hernandez, 540 U.S. 44, 52–53, 124 S. Ct. 513, 157 L. Ed. 2d 357 (2003). Unlike a disparate treatment claim, a plaintiff bringing a disparate impact claim need not present evidence of discriminatory intent. Id. at 53, 124 S. Ct. 513. Instead, the plaintiff must present two kinds of evidence to establish a prima facie case. First, the plaintiff must point to the specific employment practice that allegedly has a disparate impact. Second, the plaintiff must demonstrate causation by offering statistical evidence sufficient to show that the challenged practice has resulted in prohibited discrimination. See Hallmark Developers v. Fulton Cnty., 466 F.3d 1276, 1286 (11th Cir. 2006). While "no single test controls in measuring disparate impact," the plaintiff must produce some evidence about the population that a policy applies to, some numbers or proportional statistics, in order to survive a motion for summary judgment. Id. Even if Plaintiff had intended to proceed under this theory, she would have failed to met her burden of demonstrating that there is a genuine dispute as to any material fact, as Plaintiff presented no statistical evidence for the Court to even consider. Accordingly,

---

declines to take judicial notice of such. Further, the Court highly doubts that Defendants' counsel's survey of the women working in his law firm would pass the gatekeeping hurdle prescribed under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) and Federal Rule of Evidence 702.

Plaintiff has failed to carry her burden, and Defendants are entitled to summary judgment as to Plaintiff's claim of gender discrimination.

D.  Religious Discrimination Under Title VII

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating on the basis of religion. See 42 U.S.C. § 2000e(j) (2000).  To establish a prima facie case of religious discrimination, a plaintiff must show that: (1) she has a bona fide religious belief that conflicted with an employment requirement; (2) the employer was informed of that belief; and (3) she was discharged for failing to comply with the conflicting employment requirement. Daniels, 246 F.3d at 506; Bruff v. N. Miss. Health Svcs., Inc., 244 F.3d 495, 499 n.9 (5th Cir.), cert. denied, 534 U.S. 952, 122 S. Ct. 348, 151 L. Ed. 2d 263 (2001). If a plaintiff can make out a prima facie case, the defendant must then show either: (1) that it offered the plaintiff a reasonable accommodation, or (2) that accommodating plaintiff would subject the defendant to undue hardship. Bruff, 244 F.3d at 500; see also 42 U.S.C. § 2000e(j) (2000) (providing a defense if an "employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business").

It is undisputed that Plaintiff can meet a prima facie case of religious discrimination: she holds a bona fide religious belief, her employer knew of this belief, and she was terminated for refusing to comply with the JDC uniform policy.  Thus, the burden shifts to Defendants to come forward with evidence that it offered a reasonable accommodation, or that accommodating Plaintiff would cause undue hardship.  In this instance, Defendants proceed under the theory that accommodating Plaintiff would cause undue hardship. An

38

undue hardship exists when an employer incurs anything more than a *de minimus* cost to accommodate an employee's beliefs.[33]  See Trans World Airlines, Inc. v. Hardison, 432 U.S. 63, 84, 97 S. Ct. 2264, 53 L. Ed. 2d 113 (1977); see also Bruff, 244 F.3d at 500.  Both economic and non-economic costs can pose an undue hardship upon employers . . . ." Webb v. City of Philadelphia, 562 F.3d 256, 260 (3d Cir. 2009) (citing Hardison, 432 U.S. at 84, 97 S. Ct. 2264).[34]  Here, Plaintiff wishes to be able to wear a skirt (which is a tenet of her Pentecostal faith), as opposed to pants, while working as a juvenile detention officer. Defendants contend that accommodating Plaintiff's religious beliefs by granting her an exemption from the "no skirts" policy would create a risk to safety and security in the JDC.

In August 2010, the Third Circuit in EEOC v. The GEO Group, Inc., 616 F.3d 265 (3d Cir. 2010) held it would be an undue hardship for The GEO Group, Inc. ("GEO"), a private company that was contracted to run a prison, to allow its practicing Muslim employees to

---

[33] Compare e.g., 42 U.S.C. § 12111(10)(A) ("[Under the ADA] the term 'undue hardship' means an action requiring significant difficulty or expense[.]"); with Hardison, 42 U.S. at 84, 97 S. Ct. 2264 (under Title VII anything more than *de minimis* expense is an undue hardship).

[34] The Third Circuit, in Webb, stated that the Supreme Court's decision in Hardison "strongly suggests that the undue hardship test is not a difficult threshold to pass." 562 F.3d at 260. In Hardison, the Supreme Court held that accommodating an employee's request not to work on his Sabbath would have been an undue hardship because the proposed accommodations would have (1) caused the employer's operation to suffer by removing an employee or supervisor from his position to work plaintiff's job; (2) violated a seniority system in the collective bargaining agreement; or (3) cost the employer $150 in premium pay to another employee until the plaintiff earned sufficient seniority to obtain a position that did not require Saturday work. 432 U.S. at 77–85, 97 S. Ct. 2264. These burdens were deemed to impose "more than a *de minimis* cost" and therefore were not required under Title VII. Id. at 84, 97 S. Ct. 2264.

wear a khimar[35] as an exception to its non-headgear policy. The court reasoned that khimars, like hats, could have been used to smuggle contraband into and around the prison, conceal the identity of the wearer, and/or be used against prison employees in an attack. Additionally, it was noted that accommodating the employees would have necessarily required additional time and resources of prison officials. Thus, the court concluded that the safety and security concerns created an undue hardship as a matter of law. Id. at 275-77. The court in GEO Group relied on the prior Third Circuit holding in Webb v. City of Philadelphia. There, the Third Circuit held that the city would suffer undue hardship under Title VII if forced to permit police officers to wear religious clothing or ornamentation with their uniforms. 562 F.3d at 260-62. The court noted that "safety is undoubtedly an interest of the greatest importance to the police department and that uniform requirements are crucial to the safety of officers . . . ." Id. at 262 (internal quotations and citation omitted).

"[S]afety considerations are highly relevant in determining whether a proposed accommodation would produce an undue hardship on the employer's business. Title VII does not require that safety be subordinated to the religious beliefs of an employee." Draper v. U.S. Pipe & Foundry Co., 527 F.2d 515, 521 (6th Cir.1975); see also, e.g., EEOC v. Kelley Services, Inc., 598 F.3d 1022 (8th Cir. 2010); Bhatia v. Chevron U.S.A., Inc., 734 F.2d 1382, 1384 (9th Cir. 1984); Kalsi v. New York City Transit Auth., 62 F.Supp.2d 745 (E.D.N.Y. 1998), *aff'd mem.*, 189 F.3d 461 (2d Cir. 1999). This line of cases makes clear that an

---

[35] The khimar is an "Islamic religious head scarf, designed to cover the hair, forehead, sides of the neck, shoulders, and chest." GEO Group, 616 F.3d at 267-68. While there are many different styles of khimar, the particularity of the khimars were not at issue in the case. Thus, the court adopted the definition from the complaint. Id. at 268 n.1.

employer can be subjected to an undue hardship if the accommodation would create any significant safety, or even legal, *risks*. For example, in <u>Bhatia</u>, the Ninth Circuit affirmed summary judgment for an employer that required machinists whose duties involved potential exposure to toxic gas to shave any facial hair that prevented them from achieving a gas-tight seal when wearing a respirator. 734 F.2d 1382. All machinists were required to comply with the policy even though machinists sometimes were assigned to jobs that did not require the use of a respirator. <u>Id.</u> at 1383. Because assignments were unpredictable, the employer required all machinists to be able to use a respirator safely. <u>Id.</u> The plaintiff had worked as a machinist since before the policy against facial hair had taken effect. For religious reasons, the plaintiff did not shave. He was suspended without pay and then placed in a lower-paying job that did not expose him to gas.

The Ninth Circuit held that allowing the plaintiff to work as a machinist on assignments where he would be exposed to gas would be an undue hardship because the employer "would risk liability" under California occupational safety standards. 734 F.2d at 1384. In addition, retaining the plaintiff as machinist and assigning him only to assignments that did not involve exposure to toxic gas would impose two undue hardships on the employer. First, the employer would have to revamp its unpredictable system of work assignments. Second, the employer would have to require the plaintiff's co-workers to perform his share of dangerous work. <u>Id.</u> Affirming summary judgment for the employer, the court concluded that "Title VII does not require Chevron to go that far." <u>Id.</u> The Ninth Circuit did not require the employer to prove that the accommodation would actually violate state laws or cause injury; the increased risks were sufficient.

Relying in part on <u>Bhatia</u>, another court conducted a similar analysis and reached a similar conclusion in a case involving an employer's hard hat policy. <u>Kalsi</u>, 62 F. Supp. 2d 745, *aff'd mem.*, 189 F.3d 461 (2d Cir. 1999) (affirming "for substantially the reasons stated by the district court"). In <u>Kalsi</u>, the plaintiff's religious beliefs required him to wear a turban at all times. He was hired as a subway car inspector. The New York Transit Authority required all inspectors to wear hard hats, and it fired the plaintiff because he would not wear one. The court granted summary judgment for the employer on undue hardship grounds. The plaintiff argued that he should be allowed to perform his job (with some modifications) without a hard hat, and even his occupational safety expert opined that his position should not have required a hard hat. <u>Id.</u> at 759.[36] The plaintiff proposed that he work only inside subway cars, where there is less risk of head injury, and that he take unpaid breaks if his assigned team was performing tasks for which the employer considered hard hats most necessary. <u>Id.</u> at 759. The plaintiff's expert acknowledged that accommodating the plaintiff in this manner would increase his risk of head injury. He opined, however, that if plaintiff wore a turban, he would be unlikely to experience a "catastrophic" injury. <u>Id.</u> at 759–60. The expert also made several suggestions for how workplace hazards could be avoided so that hard hats would be unnecessary.

Rejecting the plaintiff's arguments, the court reasoned: "Title VII does not require employers to absorb the cost of all less than catastrophic physical injuries to their employees in order to accommodate religious practices." <u>Id.</u> at 760. The risks inherent in the proposed

---

[36] While Defendants in this case retained an expert and presented an expert report, the Plaintiff presented no such report or testimony.

accommodation were not limited only to the increased risk of personal injury to plaintiff. They also included the risk of injury to plaintiff's co-workers who might be called on to rescue him or who might become hurt if he were incapacitated. Id.[37] The court rejected plaintiff's expert's suggestions about possible modifications to the work environment because those modifications would have involved more than a *de minimis* cost. Id.

Similarly, in EEOC v. Oak-Rite Mfg. Corp., 2001 WL 1168156 (S.D. Ind. Aug. 27, 2001), the court was presented with a conflict between the religious beliefs of a job applicant similar to the Plaintiff's beliefs in this action and an employer's safety policies. For safety reasons, the defendant required employees to wear long pants in its metal-working factory. The EEOC sued the defendant on behalf of the job applicant whose religion required her to wear modest skirts and dresses, as opposed to pants. The EEOC claimed that the employer violated Title VII's proscription against religious discrimination because the employer failed to accommodate the job applicant by allowing her to wear a long skirt to work in the factory. The defendant employer moved for summary judgment, and the court granted the motion, finding as follows:

> Oak–Rite's pants-only policy is a facially neutral and reasonable safety measure. There is no evidence of any religious hostility on the part of Oak–Rite. An employer's duty under Title VII to accommodate religious practices is limited to workplace modifications that place no more than a de minimis burden on the employer. The accommodation that the EEOC suggests—"a reasonably close-fitting, denim or canvas dress/skirt that extends to within two or three inches above the ankle, when worn with leather above-the-ankle boots extending up under the dress/skirt"—would impose an undue hardship on Oak–Rite by requiring it to experiment with employee safety. The proposed

---

[37] Albeit for different yet similar reasons, a concern about the safety and security of other workers in the JDC is present in this action as well.

accommodation raises its own problems in terms of trade-offs between entanglement of a long skirt and/or severe restrictions on mobility and flexibility. No evidence shows that the proposed solution has worked safely in any comparable manufacturing setting. The employer's limited duty of accommodation under Title VII does not require an employer to choose between potential Title VII liability on the one hand and experimenting with increased risk of workplace injuries on the other.

Id., at *1. Along the same lines, an earlier unsuccessful EEOC action to a pants-only policy came in EEOC v. Heil-Quaker Corp., 1990 WL 58543 (M.D. Tenn. Jan. 29, 1990), where the court ruled for the employer after trial. There, the court held that "[t]he employer is not required to pursue accommodations when the employee's belief is inherently inconsistent with the employer's reasonable practice." Id. The experts in that case testified that a pants-only policy is uniform and that skirts and dresses are inherently more hazardous than pants. Id. The court noted that increased safety hazards and a corresponding increase risk of liability "are all justification[s] recognized by the [c]ourt as being undue hardships." Id.[38]

---

[38] In many other challenges to pants-only policies, there has not been the existence of a safety-based undue hardship defense under Title VII. See Killebrew v. Local Union 1683, 651 F. Supp. 95 (W.D. Ky. 1986) (union was not liable for religious discrimination under Title VII for not modifying its bumping rules to permit the plaintiff to bid on office job, which she could have performed while wearing a skirt or dress); Reid v. Kraft General Foods, Inc., 1995 WL 262531 (E.D. Pa. Apr. 27, 1995) (fact questions regarding reasons behind the timing of plaintiff's hire precluded summary judgment on Title VII reasonable accommodation issue where employer eventually hired plaintiff and allowed her to wear a skirt with her uniform; employer did not raise undue hardship defense); Seabrook v. City of New York, 2001 WL 40767 (S.D.N.Y. Jan. 16, 2001) (granting Department of Corrections summary judgment on free exercise and Fourteenth Amendment challenges to pants-only policy where plaintiff corrections officers had designed a prototype skirt to be worn with prison riot gear; Title VII claim was not yet ripe); Kisco Co. v. Missouri Comm'n on Human Rights, 634 S.W.2d 497, 498–99 & n.2 (Mo. App. 1982) (employer's pants-only policy did not violate state anti-discrimination statute, but state law did not impose duty to accommodate).

Here, as discussed under the Court's analysis of Plaintiff's free exercise claim, Defendants submitted deposition testimony, as well as an expert report, of the legitimate safety concerns presented from wearing a skirt as a juvenile detention officer in the JDC. The safety and security concerns include the ability of an officer to perform certain defense-tactic maneuvers, such as the "hip drill retreat" and the "bridge and roll." Specifically, the ability to perform these maneuvers would be impaired because "of the likelihood that the assailant could pin the material of the skirt to the floor with his knees, preventing the officer from moving her body in the way necessary to perform the maneuvers, or because it would hinder the officer's freedom to move her legs in the way necessary to perform the maneuver." Similarly, an expert report provided that a skirt would potentially interfere with an officer's ability to perform the "Hook and Drive Take Down," which is used "once the officer has back control of the attacker and needs to take them down to the ground because they are still not in compliance," as well as the "bicycle hook." The expert report goes on to detail several more maneuvers, and notes that the "issues of safety and security are not significantly lessened in a juvenile detention facility[, as] [j]uveniles are capable of injuring officers and other detainees and attempting to escape in the same manner as adults."

This report is supported by the deposition testimony of Tim Erickson, who is the school resource officer and part of the training staff at the Lee County Sheriff's Department. Moreover, Plaintiff testified as follows:

> Q:   But would you disagree with that, that at any time it's possible to get in a confrontation with an inmate that might be a life or death situation?
> A:   Yes, sir. Could be.
> Q:   In fact, at the juvenile facility you were aware that a juvenile detainee actually shot and killed a juvenile corrections officer?

> A:    Yes, sir.
>
> ***
>
> Q:    And you acknowledge there are cases where they get violent. Do you recall a situation where a juvenile assaulted Leticia Bean?
> A:    Yes, sir.
> Q:    And Leticia actually had to take this juvenile to the floor?
> A:    Yes, sir.

Further, Defendants presented several "jailer's statements" concerning incidents that had occurred between officers and juveniles that support Defendants' reliance on safety and security as legitimate concerns. In contrast, the only evidence presented by Plaintiff to counter Defendants' evidence concerning safety and security is her unsupported, subjective belief that she might be able to do some of the same maneuvers. For example, Plaintiff testified as follows:

> Q:    And you think that you're just as able to do that [referring to the bicycle maneuver] in a skirt that you wore as you would be in a pair of pants?
> A:    Yes, sir. I don't think that - - I think in the same technique that I could drop and roll and do a bicycle kick, I could do another alternative just the same.

However, Defendants' expert asserted that, in contrast to Plaintiff's deposition testimony, "there are no alternatives to the bicycle kick in the SSGT training."[39]

The Defendants have presented competent, summary judgment evidence that a skirt like Plaintiff's would indeed cause risks of respect to safety and security at the JDC.

---

[39] Plaintiff further asserts that she should be allowed to wear a skirt, and safety and security concerns should not support a finding of undue hardship, because she would have been willing to sign a written statement that she would take full responsibility for herself in her skirt. However, this would require allowing the Defendants to put not only Plaintiff herself at risk (or any other employees who wished to deviate from the uniform policy), but also to put others at risk if Plaintiff, due to her skirt, could not subdue any particular juvenile detainee.

Furthermore, to carry a burden of showing undue hardship, Defendants do not even need to prove that a skirt has—for example, in the past—actually *caused* such safety and security problems. Instead, the Defendants must show safety and security *risks*. For example, in Favero v. Huntsville Ind. Sch. Dist., 939 F. Supp. 1281 (S.D. Tex. 1996), *aff'd mem.*, 110 F.3d 793 (5th Cir. 1997), several school bus drivers claimed a school district failed to accommodate their religious holidays by allowing time off. The school district argued that accommodation would cause an undue hardship because it could not cover all the bus routes. The drivers argued that delays caused by "doubling up" on routes could not be an undue hardship because such delays occurred for other reasons. The district court rejected that argument and granted summary judgment for the school district:

> Plaintiffs' argument that because there were no children stranded by a broken down bus, plaintiffs' absence could not have created a potential for delay in delivering the children, is also without merit. Plaintiffs' emphasis on reviewing the situation in hindsight would allow employers to deny requests only when they were certain in advance that the requested absence would cause an undue hardship. This is not what Title VII requires.

Id. at 1293. The Fifth Circuit affirmed. While the Court here is sympathetic to Plaintiff's plight, given the safety and security concerns presented in the record, the Court concludes that requiring Defendants to offer Plaintiff an exemption to the "no skirts" policy would impose an undue hardship as a matter of law.[40]

---

[40] Plaintiff also relies heavily on the following deposition testimony from Sheriff Johnson to prove her religious discrimination claim:

Q:  What did you do to – what attempt did you make to accommodate Ms. Finnie's religious beliefs?

A:  **As far as accommodation, I don't know that there was any.** Because that was not the purpose of our meeting. The purpose of our meeting that I met with her over was for her to remain in the same position that

Yet, even another concern is present in this action in addition the safety and security concerns already discussed. In <u>Kelley v. Johnson</u>, the Supreme Court characterized a police department's "[c]hoice of organization, dress, and equipment for law enforcement personnel . . . [as] a decision entitled to the same sort of presumption of legislative validity as are state choices designed to promote other aims within the cognizance of the State's police power." 425 U.S. at 247, 96 S. Ct. 1440. Almost ten years later, in <u>Goldman v. Weinberger</u>, the Court stated that the "desirability of dress regulations in the military is decided by the appropriate military officials." 475 U.S. at 509, 106 S. Ct. 1310. The Court also found "the traditional outfitting of personnel in standardized uniforms encourages the subordination of personal preferences and identities in favor of the overall group mission." Id. at 508, 106 S.Ct. 1310.[41] Relying on the principles from these two cases, the Third Circuit in <u>Webb</u>, facing an issue similar to the ones presented in the case *sub judice*, concluded that the city would suffer undue hardship under Title VII if it was forced to permit police officers to wear religious clothing or ornamentation with their uniforms. 562 F.3d at 260-62. The <u>Webb</u> court relied, in part, on the Fifth Circuit's decision in <u>Daniels v. City of Arlington</u>, 246 F.3d 500, 506 (5th

---

she was in but she was requesting that she wear the skirt in that same position.
Plaintiff appears to assert that because there was no reasonable accommodation, Defendants violated Title VII. However, Defendants never contend that they accommodated Plaintiff. Instead, Defendants proceed under the *alternative* theory that any such accommodation here would cause undue hardship. And, the Court notes that this comment about reasonable accommodation is in relation to Plaintiff's ability to wear a skirt in her position as a juvenile detention officer; it is not in relation to any accommodation related to transfers to another position. The Court addresses Plaintiff's arguments concerning transferring Plaintiff to another position below.

[41] Both <u>Kelley v. Johnson</u> and <u>Goldman v. Weinberger</u> are discussed in more detail under the Court's analysis of Plaintiff's free exercise claim.

Cir. 2001). In <u>Daniels</u>, the Fifth Circuit found the city's no-pins uniform policy applicable to police officers was not only proper, but also that the city was unable to reasonably accommodate the officer's religious needs without undue hardship. The Fifth Circuit noted that "[a] police department cannot be forced to let individual officers add religious symbols to their official uniforms." <u>Id.</u>; <u>see</u> <u>also</u>, <u>e.g.</u>, <u>Rodriguez v. City of Chicago</u>, 156 F.3d 771, 779 (7th Cir. 1998) (Posner, C.J., concurring) ("The importance of public confidence in the neutrality of its protectors is so great that a police department or a fire department . . . should be able to plead 'undue hardship'. . . ."); <u>Paulos v. Breier</u>, 507 F.2d 1383, 1386 (7th Cir.1974) (recognizing and protecting the interest of municipality in preserving nonpartisan police force and appearance thereof). While, here, the uniform policy concerns detention officers in the juvenile detention center, as opposed to the police force, the rationale is at least still applicable, <u>see</u> <u>Communications Workers of America v. Ector Community Hospital District</u>, 467 F.3d 427, 439-40 (5th Cir. 2006) ("That uniforms may be more important in law enforcement than in other fields clearly does not mean that other employers have no interest in requiring them . . . There is no reason to believe that a uniform requirement will not have somewhat similar efficiency enhancing effects in the non-law enforcement context, as is clearly attested by the presence of uniforms in so many non-law enforcement occupations, e.g., postal employees, bus drivers, flight attendants, United Parcel Service personnel and a host of others."), and it certainly is supportive of the fact that allowing an exception to the "pants-only" policy would amount to undue hardship.

Plaintiff additionally contends that she should have been reasonably accommodated by being allowed to transfer to another position within the JDC; more specifically, a position that

allowed her to wear a skirt. However, according to Defendants, there were not any administrative, clerical, or other officer positions, in which Plaintiff could wear a skirt, available at the time of Plaintiff's termination. Defendants attached to their supplemental motion for summary judgment the declaration of Kamisha McKinnon, who is the administrative assistant to Sheriff Johnson. McKinnon asserts that she has access to and knowledge concerning the records of the sheriff's department and the administrative personnel of the department. McKinnon declares that according to the records and her personal knowledge of the investigation, "there were no vacancies in administrative/office/clerical positions in the sheriff's department from September 2008 through April 2009. The minimum educational qualification for those positions is a high-school diploma or GED certificate. Also, there was no vacancy in the teacher position at the JDC during that time period." Plaintiff, who lacked a GED at the time in which she worked for JDC,[42] was not qualified for the positions which would allow her to wear a skirt. Further, Defendants' testimony concerning the positions available and qualification standards remains uncontested. After Defendants filed two supplemental motions for summary judgment, providing more evidentiary support for their original summary judgment motion, Plaintiff requested an extension of time to respond to Defendants' motions and the evidence presented therein [72], which the Court granted. However, Plaintiff entirely failed to respond to such supplemental motions. Thus, not only is there competent, uncontested, summary judgment evidence before the Court asserting that no were positions available, but such evidence also

_____

[42] It is undisputed that Plaintiff did not have her high-school diploma or a GED at the time she worked for JDC. However, Plaintiff has received her GED as of recently.

establishes qualification standards for such positions—standards that Plaintiff did not meet. In Brener v. Diagnostic Center Hospital, 671 F.2d 141, 146 (5th Cir. 1982), the Fifth Circuit held that hiring a substitute employee in order to permit the plaintiff to observe the Sabbath "plainly would involve a more than *de minimis* cost." Similarly, in Bruff v. North Mississippi Health Services, 244 F.3d 495 (5th Cir. 2001), the court found that an accommodation would result in undue hardship because it would require other employees to assume disproportionate workloads. The court further noted that an employer need not actually incur costs before claiming that an accommodation would result in costs that are more than *de minimus*. Id. at 501; see also Weber v. Roadway Express, Inc., 199 F.3d 270, 274 (5th Cir. 2000) ("The mere possibility of an adverse impact on co-workers . . . is sufficient to constitute an undue hardship."); Eversley v. MBank Dallas, 843 F.2d 172, 176 (5th Cir. 1988) (determining it would be an undue hardship on an employer to require employees to switch shifts). Along the same lines, "[i]t would be anomalous to conclude that by 'reasonable accommodation' Congress meant that an employer must deny [the rights] of some employees in order to accommodate or prefer the religious needs of others, and we conclude that Title VII does not require an employer to go that far." Hardison, 432 U.S. at 81, 97 S. Ct. 2264. In other words, an employer cannot give preference to an employee because of his or her religion any more than it can discriminate against that employee for the same reason. It is axiomatic that preferential treatment involves discriminating against one in favor of another which, in the context of religion, is exactly the conduct proscribed by Title VII. See Bruff, 244 F.3d at 503. Accordingly, Defendants' uncontroverted evidence suffices to show undue hardship.

While Plaintiff does not analyze her claim under the "traditional" <u>McDonnell Douglas</u> analytical framework for discrimination cases, the Court nonetheless notes that, even if Plaintiff had, there is no evidence in the record that Defendants' safety-driven dress policy is pretext (or a motivating factor) for discrimination against religious employees, or employees requiring religious accommodation.  See <u>EEOC v. Kelley Services, Inc.</u>, 598 F.3d 1022 (8th Cir. 2010) (finding no evidence of pretext in a case where the EEOC brought suit against a temporary employment agency alleging it discriminated against a female Muslim temporary worker by failing to refer her to a commercial printing company for employment because that company had a dress policy prohibiting headware and loose-fitting clothing and the worker had refused to remove her khimar for work). The policy here is a facially-neutral requirement, applying to each employee equally.  Further, this case is distinguishable from cases such as the Third Circuit's opinion in <u>Fraternal Order of Police Newark Lodge No. 12 v. City of Newark</u>, 170 F.3d 359, 366 (3d Cir. 1999).  In that case, the Third Circuit focused on the lack of neutrality in applying a "no-beards" regulation.  Specifically, as the court explained, "the Department's decision to provide medical exemptions while refusing religious exemptions is sufficiently suggestive of discriminatory intent." <u>Id.</u> at 365. Unlike <u>Fraternal Order of Police</u>, the policy at JDC contains no such exceptions, nor is there evidence that other officers are allowed to deviate from the policy.  Yet, Plaintiff does assert that Sheriff Johnson allows detention officers to wear skirts while escorting prisoners to court. Thus, according to Plaintiff, this weakens Defendants' rationale for the "pants-only" uniform policy. However, Plaintiff's assertion is flawed and not supported by the record. Sheriff Johnson testified in his deposition – which remains uncontroverted – as follows:

Q:     Do you allow female jailers to wear skirts when they go to court?
A:     My policy is that they wear their uniform. Now, for some reason, a skirt or that type of attire to testify –
Q:     Uh-huh
A:     -- not to work. They cannot be at work. But if they are testifying in court, then – and they are off duty then they could wear it.
Q:     That would only be for a – if they're testifying. It wouldn't be to escort prisoners?
A:     No, absolutely not. It would be strictly to be a witness to testify.

Plaintiff also assert that Sheriff Johnson "admitted that Finnie was fired because of her religion . . . ." Plaintiff bases this assertion on a transcript of the audio recording of the meeting prepared by counsel for the respective parties. Plaintiff's counsel asserts that the transcript states as follows:

Finnie:     How have I failed to meet the policies?

Johnson:     You are not following the policy on my dress code. It is your choice not to follow. So, I have tried to work with you every way I could, to give you an opportunity to follow that policy and come back to work and you . . . for whatever reason, have chose not to do that.

Finnie:     **Whatever reason? Because it's my religion?**

Johnson:     **And you have filed an EEOC grievance against us.** You've got it in the court process and we'll let it run its course.

Defendants, on the other hand, assert that Plaintiff's version of the transcribed termination meeting is inaccurate.[43] Specifically, Defendants assert that "[t]he transcript makes it appear that Ms. Finnie asked a question – 'Because it's my religion?' (supposedly inquiring if her religion was the reason for her termination) which was followed by Sheriff

---

[43] The Court does not have the audio recording of the termination meeting. Instead, the Court has only been presented with the two competing versions of the transcribed meeting. However, the disputed versions of the transcript do not affect the Court's decision on Plaintiff's religious discrimination claim.

Johnson's statement . . . ." According to Defendants, Plaintiff leaves out certain pauses, words, and "fillers," and the transcript, in its correct form, "shows undisputably [sic] that Ms. Finnie was not asking a question, but rather, in response to Sheriff Johnson's statement that she had refused to follow the dress code 'for whatever reason,' was making a declarative statement that the reason she refused to follow the uniform policy was because of her religious beliefs." Defendants' transcript of the termination meeting is as follows:

> Johnson:    You are not following the policy on my dress code. And it's your choice that you chose not to follow it. So, I have tried to work with you every way I could, to give you an opportunity to follow that policy and come back to work and you, for whatever reason, have chose not to do that. **So . . .**

> Finnie:     For whatever reason? **Because, you know, uh, it's my religion, and um . . .**

> Johnson:    And you have filed an EEOC grievance against us. And you've got it in the court process and we'll let it run its court.

In either version of the transcript, Sheriff Johnson never actually mentions Plaintiff's religion.[44] It is Plaintiff herself that refers to her religious beliefs. That is, Plaintiff is the declarant of the statement concerning her religion, not Sheriff Johnson, and there is no evidence anywhere in the record that he "admitted" her religion was *the* reason, or even *a* reason, she was being terminated.[45] Further, as noted above, Plaintiff never analyzes her claim under the

---

[44] Sheriff Johnson does, however, bring up Plaintiff's EEOC charge. This is discussed under Plaintiff's retaliation claim.

[45] While Plaintiff does not specifically allege such, Plaintiff's language concerning the fact that Sheriff Johnson allegedly "admitted" that he fired Plaintiff based on her religion sounds like Plaintiff is asserting that such a statement is "direct evidence" of discrimination. "Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption." Rachid v. Jack In The Box, Inc., 376 F.3d 305, 309 n.6 (5th Cir. 2004) (quoting Sandstad v. CB Richard Ellis, Inc., 309 F.3d 893, 897 (5th Cir.

McDonnell Douglas framework, nor does she ever assert – much less prove – that Defendants' decision to terminate Plaintiff was "pretext" for religious discrimination, or that religion was a "motivating factor" in the decision. Instead, Plaintiff focuses solely on Defendants' failure to reasonably accommodate Plaintiff. But, the Court has already held that such reasonable accommodation would cause Defendants an undue hardship as a matter of law. As such, for all of the reasons discussed above, Plaintiff's claim for religious discrimination under Title VII fails, and Defendants are entitled to summary judgment as to this claim.

E.  Retaliation Under Title VII

Plaintiff next alleges that her termination was retaliation for the filing of her March 2009 EEOC charge. Before the Court turns to the merits of Plaintiff's retaliation claim, it first addresses a concern raised by Defendants in their opposition to Plaintiff's motion to amend her complaint, yet not addressed in their summary judgment motions, concerning exhaustion of administrative remedies.

It is undisputed that Plaintiff did not file an EEOC charge as to her retaliation claim. Instead, Plaintiff's EEOC charge only alleged gender and religious discrimination. However,

---

2000)). If an inference is required for evidence to be probative as to a defendant's discriminatory animus in taking the challenged employment action, the evidence is circumstantial, not direct. Sandstad, 309 F.3d at 897-98. Here, Sheriff Johnson made *no* statement concerning Plaintiff's religious beliefs and, moreover, even statements that are insufficiently direct, ambiguous, and require inferences do not amount to direct evidence of discriminatory animus. See Sandstad, 309 F.3d at 897-98 (company plan to "identify . . . younger managers . . . for promotion to senior management . . . ultimately replacing senior management" was not direct evidence of age discrimination because it required the inference that senior managers were to be fired to make room for younger trainees, rather than being replaced as they retire, change jobs, or are terminated for performance reasons).

Plaintiff's termination – and her evidence supporting her retaliation claim – occurred *after* her initial EEOC charge was filed.  In Gupta v. East Texas State University, 654 F.2d 411, 414 (5th Cir. 1981), the plaintiff, Gupta, brought a Title VII suit alleging that his former employer discriminated against him on the basis of national origin and religion. Id. at 412. Gupta filed an EEOC charge complaining of the discrimination on July 9, 1975. Id. Later, in February of 1976, Gupta filed a second charge with the EEOC, alleging various acts of retaliation that resulted from his first charge. Id. at 413. After he filed this second charge, Gupta's employer notified him that his contract would not be renewed for the following year. Id. Gupta never filed a third charge with the EEOC complaining that his employer had discharged him in retaliation for his two charges with the EEOC. The court therefore questioned its jurisdiction over the retaliatory discharge issue since "the filing of an administrative complaint is a jurisdictional prerequisite to bringing suit under Title VII." Id.

The Gupta court, however, found that it did have jurisdiction to hear the retaliatory-discharge claim despite the absence of a third charge with the EEOC. Id. at 414. It reasoned that "[i]t is the nature of retaliation claims that they arise after the filing of the EEOC charge." Id. Thus, "[r]equiring prior resort to the EEOC would mean that two charges would have to be filed in a retaliation case . . . [which] would serve no purpose except to create additional procedural technicalities when a single filing would comply with the intent of Title VII." Id. As a result, the court found that it could exercise ancillary jurisdiction over Gupta's retaliatory-discharge claim. Id. Gupta is directly on point in this action.

Some courts, however, have questioned whether Gupta's holding is still valid in light of the Supreme Court decision in National R.R. Passenger Corp. v. Morgan, 536 U.S. 101 122

S. Ct. 2061, 153 L.Ed.2d 106 (2002). In <u>Morgan</u>, the Supreme Court held that Title VII plaintiffs could not use a "continuing violation" theory to assert claims that were barred because they were based on employer acts outside the 300-day statutory window for filing an EEOC charge. <u>Id.</u> at 113-14, 122 S. Ct. 2061. After <u>Morgan</u>, "[e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" <u>Id.</u> at 114., 122 S. Ct. 2061 Although <u>Morgan</u> involved incidents that took place before the EEOC charge was filed, courts have extended it to exclude any acts that occurred after filing from piggybacking onto an earlier-filed charge. <u>See</u>, <u>e.g.</u>, <u>Martinez v. Potter</u>, 347 F.3d 1208, 1210-11 (10th Cir. 2003); <u>McKenzie v. St. Tammany Parish School Bd.</u>, 2006 WL 2054391, at *2, *3 (E.D. La. Jul. 19, 2006); <u>Prince v. Rice</u>, 453 F. Supp. 2d 14, 23-24 (D.D.C. 2006); <u>Romero-Ostolaza v. Ridge</u>, 370 F. Supp. 2d 139, 148-50 (D.D.C. 2005). Some courts have even gone a step further, holding that administrative remedies must be separately exhausted for claims of retaliation based on an earlier-filed EEOC charge that is already properly before the court. <u>See Prince</u>, 453 F. Supp. 2d at 23-24; <u>Romero-Ostolaza</u>, 370 F. Supp. 2d at 148-50.

Nevertheless, courts in the Fifth Circuit have continued to apply <u>Gupta</u> after <u>Morgan</u>. <u>See</u>, <u>e.g.</u>, <u>Eberle v. Gonzales</u>, 240 F. App'x 622, 2007 WL 1455928 (5th Cir. May 18, 2007) (discussing <u>Gupta</u>'s rationale and holding); <u>Miller v. Southwestern Bell Telephone Company</u>, 51 F. App'x 928, (5th Cir. 2002) (holding that, under <u>Gupta</u>, the plaintiff need not file an additional charge with the EEOC for a retaliation claim "growing out of" his initial charge so long as the retaliation occurs after the filing of the initial charge); <u>Stevenson v. Verizon Wireless LLC</u>, 2009 WL 129466 (N.D. Tex. Jan. 16, 2009) (discussing <u>Morgan</u>, yet still

57

applying Gupta); Cooper v. Wal-Mart Transportation, LLC, 662 F. Supp. 2d 757 (S.D. Tex. Sept. 24, 2009) (same); Lightfoot v. OBIM Fresh Cut Fruit Co., 2008 WL 4449512, at *3 (N.D. Tex. Oct. 2, 2008) (applying Gupta but distinguishing it on the facts); Ocampo v. Laboratory Corp. of America, 2005 WL 2708790, at *7 (W.D. Tex. Sept. 6, 2005) ("Assuming the claims based on the charge of age discrimination are properly before the Court, and given [Gupta], Ocampo was not required to file a second charge of discrimination."); Green v. Louisiana Casino Cruises, Inc., 319 F. Supp. 2d 707, 710-11 (M.D. La. 2004) (citing Gupta and two later Fifth Circuit cases for the proposition that "a plaintiff is not required to exhaust administrative remedies before seeking review of a retaliation claim that grows out of an earlier EEOC charge"); see also Houston v. Army Fleet Services, LLC, 509 F. Supp. 2d 1033 (M.D. Ala. 2007) (citing Gupta, which is binding in the Eleventh Circuit as well); White v. Potter, 2007 WL 1330378, at *7 (N.D. Ga. Apr. 30, 2007) (finding Gupta's policy rationale persuasive, recognizing the D.C. District Court's post-Morgan opinions as rejecting Gupta's holding, but deciding not to follow the D.C. decisions "given that Gupta is binding precedent in [the Eleventh] Circuit").

While Morgan arguably calls Gupta's holding into question, the Supreme Court did not squarely address the issue presented in Gupta. Morgan merely reemphasized the importance of treating discrete acts separately for the purpose of determining when the time limits for filing a charge with the EEOC expire. Morgan further never addressed the policy considerations Gupta took into account in deciding that a plaintiff need not file a new charge with the EEOC when a new discrete act "grows out" of an act for which the plaintiff has already filed a charge with the EEOC. Gupta, 654 F.2d at 414. Thus, because Defendants'

failed to reurge this issue in their summary judgment motion, and until the Supreme Court or Fifth Circuit reassess the holding in Gupta,[46] this Court is bound to follow its holding. Therefore, Plaintiff's retaliation claim falls within an exception to the exhaustion requirement, allowing it to proceed.[47]

The Court now turns its focus to the merits of Plaintiff's retaliation claim. The McDonnell Douglas test is applicable to Title VII unlawful retaliation cases. Byers v. Dallas Morning News, Inc., 209 F.3d 419, 427 (5th Cir. 2000). A plaintiff establishes a prima facie case of retaliation under 42 U.S.C. § 2000e-3(a) by showing that: (1) she engaged in an activity protected by Title VII; (2) she was subjected to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action. See Stewart v. Mississippi Transp. Comm'n, 586 F.3d 321, 331 (5th Cir. 2009).

Once the plaintiff makes out a prima facie case of retaliation, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the employment action. Aryain v. Wal-Mart Stores Tex. LP, 534 F.3d 473, 484 (5th Cir. 2008). To survive summary judgment, plaintiff must then offer evidence that (1) the defendant's reason is not true, but is

---

[46] In Sapp v. Potter, 413 F. App'x 750, 2011 WL 661544, at *3 n.2 (5th Cir. Feb. 22, 2011), the Fifth Circuit, after discussing Gupta, noted that "[s]ome circuits have [ ] held that the Supreme Court's Morgan decision abolished or narrowed the Gupta exception . . . We need not address the potential abolition of the Gupta exception because the facts of this case do not support the exception's application." In that case, the court found that Gupta did not apply to Plaintiff's retaliation *and discrimination* claims, noting that Gupta had been applied to retaliation claims alone.

[47] However, the Court notes that Gupta and its rationale are not applicable when the alleged retaliation occurs *before* the filing of the EEOC charge. See Eberle v. Gonzales, 240 F. App'x 622, 2007 WL 1455928 (5th Cir. May 18, 2007). Thus, Plaintiff's complaints of retaliation occurring before the EEOC charge are barred, as Plaintiff's EEOC charge did not include a retaliation claim and they do not fall within Gupta's exception.

instead a pretext for retaliation (pretext alternative), or (2) the defendant's reason, though true, is only one of the reasons for its conduct, and another motivating factor is retaliation for the plaintiff engaging in protected activity (mixed-motives alternative). See Rachid v. Jack in the Box, Inc, 376 F.3d 305, 312 (5th Cir. 2004); Smith v. Xerox Corp., 602 F.3d 320, 330-33 (5th Cir. 2010).

As background, on March 18, 2009, Plaintiff met with her attorney, who drafted a letter to Sheriff Johnson concerning the "pants-only" uniform policy and Plaintiff's religious beliefs. Sheriff Johnson did not respond to Plaintiff's counsel's letter.  On March 19, 2009, Plaintiff filed a charge with the EEOC, alleging gender and religious discrimination. On April 13, 2009, Plaintiff alleges that she met with Steve White, who told her to "just put your pants on and come back to work." Plaintiff informed White that she could not do so due to religious reasons. On April 14, 2009, Plaintiff met with Sheriff Johnson, and her employment was terminated.[48]

It is undisputed that Plaintiff's filing of an EEOC charge constitutes protected activity under Title VII.  The Court also concludes that, in viewing the evidence in the light most favorable to Plaintiff, Plaintiff's April 2009 termination satisfies the second prong of

---

[48] As discussed *supra*, there is a dispute between the parties concerning the actual date of the termination meeting. According to Plaintiff, the termination occurred on April 14, 2009, which would be four weeks after the EEOC charge was filed and sent to Sheriff Johnson. Under Defendants' version of the facts, the time frame was approximately six weeks, as Defendants contend that the termination meeting occurred later in April 2009.  This dispute in no way impacts the Court's decision. However, the Court notes that it is accepting Plaintiff's version of the facts for purposes of this Memorandum Opinion alone.

Plaintiff's prima facie retaliation claim.[49] Defendants, however, contend that that Plaintiff cannot meet the third prong of a prima facie case: a causal link between the filing of the EEOC charge and the termination. To establish a 'causal link' as required by the third prong of the prima facie case, a plaintiff does not have to prove that his protected activity was the sole factor motivating the employer's challenged actions. Gee v. Principi, 289 F.3d 342, 345 (5th Cir. 2002). Close timing between an employee's protected activity and an adverse action against the employee may provide the causal connection needed to make out a prima facie case of retaliation. McCoy v. City of Shreveport, 492 F.3d 551, 562 n.28 (5th Cir. 2007); Swanson v. Gen. Srvs. Admin., 110 F.3d 1180, 1188 (5th Cir. 1997). However, if the only evidence of a prima facie causal link is "mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action," then "the temporal proximity must be very close." Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273-74, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001) (per curiam) (citations and internal quotation marks omitted) (citing with approval cases holding that three and four-month gaps between an

---

[49] Defendants argue that the second prong of the prima facie case is not met because, while Plaintiff was not terminated until after she filed her EEOC charge, "the ultimatum that ultimately resulted in her termination – that she must wear pants or lose her job – was given on March 16, 2009, prior to the filing of the EEOC charge . . . ." While Plaintiff was indeed told by Steve White that she could not wear a skirt as a juvenile detention officer prior to the filing of her EEOC charge, she was not terminated until *after* the filing of the charge.  In fact, at one point, Plaintiff was told by Steve White that she would only be suspended for three days without pay if she wore the skirt.  Steve White's action of merely informing Plaintiff that she could not wear a skirt does not constitute the adverse employment action at issue (nor would it likely constitute an adverse employment action in general). Instead, the adverse employment action at issue is the April 2009 termination, which clearly occurred after the EEOC charge. Further, Defendants also note in their brief that, "for purposes of this motion only, the defendants assume for the sake of argument that Ms. Finnie has established the first two prongs of the prima facie case."

employer's knowledge of a protected activity and an adverse employment action are *insufficient* and too long, standing alone, to establish a prima facie causal link). Even beyond temporal proximity alone,

> The courts have [also] sketched an outline of indicia of causation in Title VII cases, because causation is difficult to prove. Employers rarely leave concrete evidence of their retaliatory purposes and motives. For example, in Jenkins, the court looked to three factors for guidance in determining causation. First, the court examined the employee's past disciplinary record. Second, the court investigated whether the employer followed its typical policy and procedures in terminating the employee. Third, it examined the temporal relationship between the employee's conduct and discharge. Jenkins, 646 F. Supp. at 1278. This analysis is highly fact specific, as the Supreme Court recently noted. St. Mary's, 509 U.S. at [524], 113 S. Ct. [2742] ("the question facing triers of fact in discrimination cases is both sensitive and difficult.") (quoting United States Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 716, 103 S. Ct. 1478, 1482, 75 L. Ed. 2d 403 (1983)).

Nowlin v. Resolution Trust Corp., 33 F.3d 498, 507-09 (5th Cir. 1994). Here, because the Court finds the close timing alone (less than one month) minimally sufficient for purposes of the motion at bar to establish a prima facie case, the Court need not address the other factors discussed in Nowlin.[50]

---

[50] Defendants assert that a causal link cannot exist, even given the close temporal proximity, because the Plaintiff's actions amounted to a "constructive resignation," which Defendants contend is when an employee tells an employer that he or she will not do work, yet he or she will not quit either. Defendants fail to adequately support, for purposes of summary judgment, their assertion that Plaintiff constructively resigned. While Plaintiff asserted that she could not abide by the "pants-only" policy, Plaintiff testified that she took her vacation leave in hopes that she would be reasonably accommodated. Plaintiff never testified that she was resigning. In fact, Plaintiff did not resign; she was officially terminated. Defendants also, relying on a case from the Third Circuit where the court found an inference of retaliatory motive illogical where the articulated reason existed before the protected activity occurred, assert that retaliatory motive cannot be found here because Plaintiff was told she could not wear a skirt prior to her filing of the EEOC charge. See Cohen v. Austin, 901 F. Supp. 945, 951 (E.D. Pa. 1995), aff'd, 107 F.3d 6 (3d Cir. 1997). While the Court agrees that the reasoning in Cohen is rational, the Court finds it inapplicable here. The Court

After concluding that, for purposes of summary judgment, Plaintiff has presented a prima facie case of retaliation, the burden shifts to Defendants to articulate a legitimate, non-retaliatory reason for the employment action. Defendants' reason for Plaintiff's termination is that Plaintiff failed to comply with the JDC uniform policy.  This articulated reason satisfies Defendants' burden of production.  As such, in order to survive summary judgment, Plaintiff must offer evidence that (1) the defendant's reason is not true, but is instead a pretext for retaliation (pretext alternative), or (2) the defendant's reason, though true, is only one of the reasons for its conduct, and another motivating factor is retaliation for the plaintiff engaging in protected activity (mixed-motives alternative). According to the Fifth Circuit, "[a] plaintiff can only avoid summary judgment on 'but for' causation by demonstrating 'a conflict in substantial evidence on this ultimate issue.'" Nunley v. City of Waco, 2011 WL 3861678, at *5 (5th Cir. Sept. 1, 2011) (quoting Hernandez v. Yellow Transp., Inc., 641 F.3d 118, 129 (5th Cir. 2011)). Evidence is "substantial" if it is of a quality and weight such that "reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." Id.

In Nunley, the Fifth Circuit addressed retaliation post- the court's decision in  Smith v. Xerox Corp., 602 F.3d 320 (5th Cir. 2010), where the court held that the Price Waterhouse "mixed motive" framework applies to Title VII retaliation cases, and a plaintiff may show that a protected activity was a "motivating" or "substantial" factor. The Fifth Circuit in Smith also dispensed with the previous requirement that a plaintiff offer direct evidence of retaliation in

in Cohen found retaliatory motive "plainly illogical *in light of the record*" that existed in that case. Id. (emphasis added).  As discussed *infra*, given the record that exists in this case, the finding of a causal nexus is not plainly illogical.

order to proceed on the mixed-motive theory. The plaintiff in <u>Nunley</u>, relying on the <u>Smith</u> decision, argued that a Title VII retaliation claim need only offer evidence that retaliation was a factor, i.e., that the City had "mixed motives," and such evidence may be circumstantial. The Fifth Circuit, responding to such an argument, stated as follows:

> But as we explained in <u>Long v. Eastfield College</u>, 88 F.3d 300 (5th Cir. 1996), there are different tests for causation within the <u>McDonnell Douglas</u> framework—the initial "causal-link" required for making out a prima facie case, and the "but for" causation required after the employer has offered a legitimate, non-discriminatory justification. <u>Id.</u> at 305 n.4 ("At first glance, the ultimate issue in an unlawful retaliation case—whether the defendant discriminated against the plaintiff because the plaintiff engaged in conduct protected by Title VII—seems identical to the third element of the plaintiff's prima facie case—whether a causal link exists between the adverse employment action and the protected activity. However, the standards of proof applicable to these questions differ significantly. . . .The standard for establishing the 'causal link' element of the plaintiff's prima facie case is much less stringent."). Indeed, the Court's opinion in <u>Xerox</u> affirms that the <u>Price Waterhouse</u> mixed-motive approach as applied in the retaliation context preserves an employer's ability to escape liability by refuting but for causation. <u>Xerox</u>, 602 F.3d at 333 ("[T]he mixed-motives theory is probably best viewed as a defense for an employer. This 'defense' allows the employer—once the employee presents evidence that an illegitimate reason was a motivating factor, even if not the sole factor, for the challenged employment action—to show that it would have made the same decision even without consideration of the prohibited factor." (emphasis added) (footnote and internal quotation marks omitted)); <u>see</u> <u>also</u> <u>Manaway v. Med. Ctr. of Southeast Tex.</u>, 430 Fed. Appx. 317 (5th Cir 2011) ("The burden then shifts back to the employee to 'prove that the protected conduct was a 'but for' cause of the adverse employment decision.'" (quoting <u>Hernandez</u>, 641 F.3d at 129)). Thus, our decision in <u>Xerox</u> did not dispense with this final "but for" requirement for avoiding summary judgment.

Nunley, 2011 WL 3861678, at *5.[51]

     In an attempt to show a retaliatory motive, Plaintiff here presented, among other things, the transcript of Plaintiff's termination meeting with Sheriff Johnson. As discussed above, there is a dispute concerning portions of the transcribed meeting. Plaintiff's counsel asserts that the transcript states as follows:

> Finnie:       How have I failed to meet the policies?
>
> Johnson:    You are not following the policy on my dress code. It is your choice not to follow. So, I have tried to work with you every way I could, to give you an opportunity to follow that policy and come back to work and you . . .for whatever reason, have chose not to do that.
>
> Finnie:       Whatever reason? Because it's my religion?
>
> Johnson:    **And you have filed an EEOC grievance against us. You've got it in the court process and we'll let it run its course.**

Defendants, on the other hand, assert that Plaintiff's version of the transcribed termination meeting is inaccurate.[52] Defendants' transcript of the termination meeting is as follows:

> Johnson:    You are not following the policy on my dress code. And it's your choice that you chose not to follow it. So, I have tried to work with you every way I could, to give you an opportunity to follow that policy and come back to work and you, for whatever reason, have chose not to do that. So . . .
>
> Finnie:       For whatever reason? Because, you know, uh, it's my religion, and um . . .

---

[51] In short, and according to Nunley, the only thing the mixed-motive analysis does is increase the bar for a defendant to reach before the ultimate burden of proving but-for causation reverts to the plaintiff.

[52] The Court notes that the disputed versions of the transcript do not affect the Court's decision on Plaintiff's retaliation claim.

Johnson:     **And you have filed an EEOC grievance against us. And you've got it in the court process and we'll let it run its course.**

In both versions of the transcript, Sheriff Johnson discusses Plaintiff's EEOC charge during a discussion concerning Plaintiff's termination. Unlike Plaintiff's assertions under her religious discrimination claim, here, Sheriff Johnson is the declarant of the statement, and he alludes to the EEOC charge, without questioning from Plaintiff, *while explaining to Plaintiff the reasoning behind her termination*. That is, Sheriff Johnson is the not only the speaker of the statement concerning Plaintiff's protected activity, but he is the one who actually brings it up while officially terminating Plaintiff's employment. Although this statement does not qualify as direct evidence,[53] as Plaintiff at times appears to suggest, viewing the evidence in the light most favorable to Plaintiff, it does qualify as proper circumstantial evidence of a retaliatory motive.[54] The statement was made by Sheriff Johnson (the decisionmaker), during the

---

[53] "Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption." Rachid v. Jack In The Box, Inc., 376 F.3d 305, 309 n.6 (5th Cir. 2004) (quoting Sandstad v. CB Richard Ellis, Inc., 309 F.3d 893, 897 (5th Cir. 2000)). If an inference is required for evidence to be probative as to a defendant's discriminatory animus in taking the challenged employment action, the evidence is circumstantial, not direct. Sandstad, 309 F.3d at 897-98. This statement is insufficiently direct and unambiguous to establish unlawful retaliation without inferences. See id. (company plan to "identify . . . younger managers . . . for promotion to senior management . . . ultimately replacing senior management" was not direct evidence of age discrimination because it required the inference that senior managers were to be fired to make room for younger trainees, rather than being replaced as they retire, change jobs, or are terminated for performance reasons).

[54] In the context of unlawful discrimination, the Fifth Circuit has stated that, [c]omments are evidence of discrimination only if they are (1) related to the protected class of persons of which the plaintiff is a member, (2) proximate in time to the complained-of adverse employment decision, (3) made by an individual with authority over the employment decision at issue, and (4) related to the employment decision at issue." Jackson v. Cal-Western Packaging Corp., 602 F.3d 374, 380 (5th Cir. 2010); Jenkins v. Methodist Hospitals

termination meeting, and it was clearly related to the protected activity engaged in by Plaintiff. While a very close call, the Court cannot, at the summary judgment stage, do as Defendants would suggest and weigh evidence and credibility to determine exactly what Sheriff Johnson meant by his comment; instead, what inferences should be drawn from the remark depend on determinations best left to the trier of fact. Accordingly, disputes of material facts exist, and summary judgment is denied as to Plaintiff's retaliation claim.[55]

## CONCLUSION

For the reasons stated above, Defendants' Motions for Summary Judgment are granted in part and denied in part. Defendants' motions are granted with respect to Plaintiff's First Amendment free speech and free exercise claims. The motions are further granted with respect to Plaintiff's Title VII gender and religious discrimination claims. The motions are denied, however, as to Plaintiff's VII retaliation claim.

So ordered on this, the __17th__ day of ___January_____, 2012.


/s/   Sharion Aycock_____
**UNITED STATES DISTRICT JUDGE**

---

of Dallas, Inc., 478 F.3d 255, 262-63 (5th Cir. 2007) (citing Patel v. Midland Mem'l Hosp. & Med. Ctr., 298 F.3d 333, 343-44 (5th Cir. 2002)). Comments which do not meet these criteria are considered "stray remarks" and, standing alone, are insufficient to defeat summary judgment. Jackson, 602 F.3d at 380.

[55] While this action may proceed at trial as a "mixed-motives" case, the Court need not decide at this juncture whether this case is properly labeled a "pretext" case or a "mixed motives" case. See Smith, 602 F.3d at 333.